John S. JOHNSON, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 93–SC–605–MR.

Supreme Court of Kentucky.

Nov. 23, 1994.

Rehearing Denied March 23, 1995.

Stephan Charles, Manchester, for appellant.

Chris Gorman, Atty. Gen., Lana Grandon, Asst. Atty. Gen., Crim. Appellate Div., Frankfort, for appellee.

SPAIN, Justice.

John S. Johnson appeals as a matter of right his conviction of murder by a jury in

the Leslie Circuit Court for which he was sentenced to life imprisonment.

On the evening of July 26, 1992, nineteen-year-old Brian Sizemore, the victim of this homicide, was visiting in the home of his uncle George Sizemore in Leslie County, in the company of several other relatives and friends. Brian's father, Bobby Sizemore; and Dean Rice, a friend, were drinking along with the host, George. The appellant, John Johnson, drove up in his pickup truck, parked, and came into the house upon invitation of George, who gave him their last beer. Johnson had a .357 magnum revolver stuck in his belt, which he laid on the table, around which the men were sitting and drinking.

In a little while, the appellant went out to his truck and got some more beer, which he brought into the house. Later the appellant, Johnson, and Brian's father, Bobby, got into a scuffle and began struggling over possession of the pistol. During the struggle, the pistol discharged with the bullet striking George's finger. In the scuffle, Bobby got control of the pistol and hit the appellant over his eye with it. Johnson left the house without his pistol, got into his truck and backed onto the main highway, and apparently drove off.

A few minutes later, Bobby's son, Brian, also decided to leave. He backed his truck out of the driveway and onto the main highway, at which time shots rang out. Brian was found in his truck, shot to death. He was taken to the hospital, and Kentucky State Police Detective Johnny Sizemore, who was not related to Bobby or his son, Brian, was called to investigate.

Detective Sizemore interviewed witnesses, recovered two 7.62 × 39 mm. cartridge cases at the scene, observed broken glass lying in the driveway, photographed and impounded the victim's truck, and removed bullet fragments from a tree and a post at the scene, from the dashboard of the victim's truck, and from a table in the George Sizemore home.

Based on his investigation, Detective Sizemore concluded that as Brian Sizemore was backing his pickup truck onto the main highway, the appellant had driven by and fired his 7.62 × 39 mm. caliber SKS rifle at Brian's truck, perhaps thinking it was Brian's father, Bobby Sizemore, and that one of the bullets struck Brian in the head, causing his death.

The appellant Johnson could not be located after the shooting, and on August 18, 1992, he was indicted for murder. Over three months after the shooting, the appellant surrendered himself to the jailer in Pulaski County on November 2, 1992, and was arrested. His trial began on July 12, 1993, and extended over six days, with the jury returning its guilty verdict on July 19, 1993. On July 26, 1993, one year to the day following the murder, the appellant was sentenced to life imprisonment.

## I. PRESERVATION OF PHYSICAL EVIDENCE

Although the appellant levels a blanket accusation that he was denied due process throughout this prosecution, trial, and conviction; and that he was "railroaded into prison for the remainder of his life," his principal complaint concerns the handling of physical evidence by the Kentucky State Police and the refusal of the trial judge to give the appellant's tendered instruction thereon.

Detective Sizemore testified that he took photographs of the table at George Sizemore's house from which a bullet was recovered, and of the victim's truck. He also called in Charles Lanham, a firearms expert from the KSP crime laboratory, who inspected and took additional photographs of the victim's truck. When they had finished with the victim's truck, it was returned to his family two days after the shooting. His father had the damage repaired and repainted. Although the appellant could not then be located, and did not surrender himself on the indictment until November of 1992, over three months later, he now complains that he was denied due process by the failure of the KSP to retain the truck. He makes the same complaint with regard to a wooden post which Detective Sizemore had to split in two in order to recover a bullet fragment lodged inside. Similarly, he complains that the table from which the detective recovered another bullet in the George Sizemore house was not available for his examination. The appel-

lant's brief makes the exaggerated accusation that the Commonwealth intentionally destroyed physical evidence and likens this conduct to that of the Commonwealth in *Sanborn v. Commonwealth*, Ky., 754 S.W.2d 534 (1988). In that case, a Commonwealth's Attorney admitted intentionally erasing the tape-recorded statements of four witnesses, three of whom testified at trial for the prosecution. We described these acts of the prosecutor as "misconduct of constitutional proportions under *Brady v. Maryland*, 373 U.S. 83, 88, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215, 219 (1963), and its progeny." *Id.*, 754 S.W.2d 534 at 539.

We think the criticism here is completely without merit. In the instant case, there was absolutely no showing of any bad faith on the part of Detective Sizemore, Mr. Lanham, or any prosecutor. On the contrary, the appellant, once he returned to face the charges and stand trial, was furnished numerous photographs of all the physical evidence, including the victim's truck and the post and table where bullet fragments had lodged. Further, with regard to the table, the appellant's counsel conceded at oral argument that while the trial was still in progress, he learned that the table was intact after all, but he never took the time to go and look at it.

■ The appellant's brief erroneously describes the return of the victim's truck to his family by Detective Sizemore as "destroying or concealing evidence." The brief also claims that the truck "was deliberately released to the family outside normal Kentucky State Police procedure." Yet the record is devoid of any proof of any procedural rule or regulation of the KSP that so provides, which Detective Sizemore might have violated. The only testimony that even vaguely suggests such a general policy, without any specific time limits, is the following cross-examination of Detective Sizemore:

Q. And as a detective you are kept updated on evidence collection and handling procedures?

A. Yes.

Q. And isn't it true Detective you are trained and required by the Kentucky State Police to gather and preserve physical evidence?

A. Yes.

Q. So we don't need to go through these orders because you recognize that you are required to gather, preserve and maintain the integrity of physical evidence that you gather in the course of investigation?

A. Yes sir.

■ Notwithstanding all the above, the trial court nevertheless gave the jury a "missing evidence" instruction as approved in *Sanborn, supra*, as follows:

Instruction No. 2: If you believe from the evidence that there existed certain items that were potential evidence, and that the agents or employees of the Commonwealth intentionally destroyed the same, you may, but are not required to, infer that these items would be, if available, adverse to the Commonwealth and favorable to the defendant.

The appellant objected to the court's instruction and tendered one of his own which the court correctly rejected. It read as follows:

The Commonwealth has lost or released several pieces of evidence involved in this case including the pickup truck in which Brian Sizemore was killed, a table from Mildred Sizemore's home, a post from the area of the shooting and a tape recorded statement taken from Kathy Davidson. In your deliberations you may assume that these articles of evidence, if available now, would be favorable to John S. Johnson's case.

Unlike the instruction approved by us in *Sanborn, supra*, the appellant's tendered instruction was tantamount to *requiring* the jury to assume that all the physical evidence observable on or about the victim's truck, the split post, and the Sizemore table "would be favorable" to the defendant's case. We know of no authority to support any such instruction. On the contrary, we are of the opinion that the trial court's instruction showed that he "bent over backwards" to be fair to the appellant with regard to the physical evidence issue.

## II. ALLEGED PROSECUTORIAL MISCONDUCT

■ The appellant complains that the Commonwealth's Attorney "took the posture of representing the Sizemore family rather than the Commonwealth of Kentucky." He states that "[f]rom the shooting forward the Sizemores conducted the investigation and the State Police and Commonwealth's Attorney's Office tailored their preparation and presentation of the case according to the Sizemores' conclusions." Of course, none of these allegations was preserved for appellate review. The appellant has failed to cite any proof indicating that these matters were brought to the attention of the trial court or where any relief was requested. RCr 9.22; *McDonald v. Commonwealth*, Ky., 554 S.W.2d 84 (1977). Finally, the appellant has not cited any legal authority supporting his arguments.

■ Similarly, appellant's claims of prosecutorial misconduct regarding questions asked about whether there was a full moon at the time of the shooting, certain questions asked on cross-examination of defense witnesses, and an impeachment question about a prior felony conviction, all were not objected to at trial. Accordingly, they were waived. *Salisbury v. Commonwealth*, Ky.App., 556 S.W.2d 922 (1977).

## III. VENUE AND JUROR ISSUES

Some two months before the trial began, the trial court held a hearing on the appellant's motion for a change of venue. Several witnesses testified for each side, and numerous affidavits were filed regarding whether the defendant could receive a fair trial in Leslie County. At the conclusion of the hearing the trial court denied the motion for a change of venue, but stated that the defense could renew the motion during the subsequent jury selection process.

■ On July 12, 1993, jury selection began, and on the following day a jury of twelve plus two alternates was seated. The appellant did not renew his motion for a change of venue at any time during this process and accordingly he waived any objection as to venue. *Epperson v. Commonwealth*, Ky., 809 S.W.2d 835 (1991).

■ One of the jurors who sat on the case, Mr. Boggs, informed the court in chambers before the Commonwealth · completed its proof, that he felt he could not continue to sit as a juror because of what he considered to be unjustifiable delays in the trial and the fact that the jury was sequestered. After Boggs left the court's chambers, the judge asked counsel for their thoughts. Defense counsel stated that he didn't know what to think since he had never been in a similar situation. The court responded that he was going to require Boggs to continue sitting on the jury and that defense counsel could decide whether they wanted to object to his continuing to serve. Finally, before the case was submitted to the jury, the defense requested that Mr. Boggs be excused as an alternate juror. The court granted the request and finally excused Mr. Boggs.

■ The appellant now argues that the court's initial decision to require Mr. Boggs to continue to sit as a juror was "vindictive and erroneous," and that his continued service "contaminated" the jury. We find no error in the trial court's exercise of his discretion. The record reveals no objection by the defense to the court's initial decision for the juror to continue to serve and consequently any such objection was waived. Upon the defense's later request that the juror be excused, the court granted the request. No further remedy is available on this appeal.

Finally, the appellant argues that jurors Agnes Melton and Lillian Hayes "were not entirely forthcoming on voir dire" and that accordingly he is entitled to a new trial.

■ The appellant, after the trial, obtained an affidavit from his daughter-in-law that she had been a student in teacher Agnes Melton's class at school the previous year and went on a field trip to the courthouse to observe part of a trial. As it turned out, the appellant was the defendant in that trial, which concerned some unrelated matter.

During voir dire in the instant trial, the prosecution asked whether any juror had ever been interested in a criminal defense,

had a family member who was personally involved, or "watched a case or anything like that." Ms. Melton had responded that someone in her husband's family had been murdered and she had been interested in the prosecution of that case. She nevertheless stated that she did not believe this would create any problem as to her serving as a juror. She made no specific allusion to the school field trip the previous year, nor was she asked about it in any other way.

The record reveals that throughout the voir dire examination, Ms. Melton showed her apparent willingness to be truthful and to answer all questions asked about her acquaintance with the appellant and the victim and their families, as well as with potential witnesses. The trial judge gave the appellant the opportunity to call Ms. Melton or other witnesses regarding the field trip and her previous answers to questions asked on voir dire, but he chose not to pursue the matter. Following the hearing, the trial court found nothing that established that Mrs. Melton "intentionally made any misstatement or withheld any information."

■ As to juror Lillian Hayes, the appellant asserts that when the jury panel was asked how many had previously served on a jury panel, Ms. Hayes did not respond. The appellant states that he learned after the trial that in 1972 a Lillian Hayes sat on the jury during the trial of the appellant and his brother, Randall Johnson, for shooting into an occupied dwelling. Randall Johnson pled guilty but the appellant was not convicted. The trial court observed at the hearing on the motion for a new trial that there was no showing whatever that this was the same person as sat on this case. He added that, even if he knew it was the same person, he could not say that she "gave false information" about a matter that happened twenty-one years ago.

We find no abuse of discretion on the part of the trial court in denying the motion for judgment N.O.V. or for a new trial on these grounds.

For all the reasons set out above, the judgment and sentence of the Leslie Circuit Court are affirmed.

LAMBERT, REYNOLDS and WINTERSHEIMER, JJ., concur in this opinion by SPAIN, J.

STUMBO, J., dissents by separate opinion in which STEPHENS, C.J., and LEIBSON, J., join.

STUMBO, Justice, dissenting.

Respectfully, I must dissent as to the majority's treatment of the missing evidence instruction issue and the issue in regard to juror Boggs. While I agree with the majority that there is no showing of bad faith on the part of the Commonwealth in regard to the missing evidence, I believe that the instruction as given was incorrect in that this is not a case of the intentional destruction of evidence, but rather a negligent failure to preserve material evidence.

The instruction given was as follows:

> If you believe from the evidence that there existed certain items that were potential evidence and that agents or employees of the Commonwealth intentionally destroyed the same, you may, but are not required to, infer that these items would be, if available, adverse to the Commonwealth and favorable to the defendant.

The problem with the instruction is that it injects fact issues which do not exist. Specifically, there is no dispute that the truck involved was released by the State Police to the victim's family, which was contrary to normal procedure, and promptly repaired. Moreover, there is no dispute that the condition of the truck, including the exact location of the bullet holes, was one of the most critical, if not the most critical, piece of physical evidence in the case. As such, there is no basis for the jury to decide that the evidence was not lost, nor that only potential evidence was lost. As a result, I would conclude that the instruction as given was erroneous.

When it is established that the Commonwealth has failed to preserve material evidence, which loss was substantially to the prejudice of defendant's right to a fair trial, the defendant is entitled to relief, of which the least available is an appropriate missing evidence instruction. *Tinsley v. Jackson,*

Ky., 771 S.W.2d 331, 332 (1989). The instruction should be closely tailored to the specific factual situation of each case, and not create fact issues when they do not exist. The instruction as given implied that the jury must first determine that the evidence was intentionally destroyed by the Commonwealth. My reading of the record indicates that it was not an intentional destruction, but rather a negligent release of said evidence. Thus, I believe that an appropriate instruction would be as follows:

The Commonwealth has lost or released several pieces of evidence involved in this case including the pickup truck in which Brian Sizemore was killed, a table from Mildred Sizemore's home, a post from the area of the shooting and a tape recorded statement taken from Kathy Davidson. In your deliberations you may infer, but you are not required to infer, that these articles of evidence, if available now, would be favorable to John S. Johnson's case.

Thus the jury would not be required to address the issue of an intentional destruction of evidence before considering the effect of said evidence on their deliberations.

The juror, Mr. Boggs, had been sequestered with the rest of the jury beginning July 13, 1993, a Tuesday. The Commonwealth presented evidence on Wednesday and Thursday, July 14 and July 15, respectively. Because the trial court had its regular motion docket in the other two counties in the circuit, and because of difficulties scheduling a witness, there were no proceedings on Friday, July 16. The juror made his complaints known before the trial resumed on the morning of Saturday, July 17, when the Commonwealth was to conclude its case.

The juror was unhappy about delays in the trial caused by the parties' failure to secure the attendance of the witness, and with being sequestered. The juror further stated, "I don't believe I'm going to give fair weight to the defense because I am going to be wondering [sic] getting out of here. Daydreaming so to speak ..." The juror was also of the opinion that even though sequestration had been mentioned during voir dire, it was only an unlikely option. He concluded by stating that, "I will state that I'm not sure I can make a fair judgment." The trial court asked Johnson's counsel what he wanted to do, but cut him off before he could express any real decision, and indicated that the matter could be considered. The trial court decided to keep the juror on the case regardless of his expressed disaffection. After the close of all the evidence, the trial court remarked upon the juror's subsequent behavior saying:

Well I have heard what [the juror] said the other day. I have noticed on ... numerous occasions have paid close attention to [the juror] ... throughout the taking of evidence for both the Commonwealth and for the defendant and I noticed during closing arguments. I don't know whether he heard what was said or sworn to or not, but he certainly tried to give the impression that he was not paying attention or he was not paying attention. When you've got thirteen people seated out there and twelve are looking at the witness and one's not and it is repeated and it is consistent it is to uh—the point I feel his actions were totally inappropriate for a juror and I have not made up my mind what I will do with [the juror] at this point other than excuse him from this case.

Johnson argues that this juror's enforced presence with the sequestered jurors over the weekend tainted the whole jury. I must agree. It requires no great leap of faith to conclude that a juror who has expressed the level of disaffection reached in this case with being sequestered, and whose subsequent behavior indicates nothing less than outright contempt, is going to make his feelings known to his fellow jurors when forced to continue on the jury. This can only adversely impact the jury's ability to properly consider Johnson's case.

The adverse impact of this error on Johnson's case is amply demonstrated by the trial court's comments and that the jury returned a guilty verdict some twelve minutes after retiring to deliberate, which is scarcely enough time to elect a foreperson, read the six instructions given, and vote, much less carry on any meaningful discussion of the four days of evidence.

I would reverse the judgment of the trial court and remand for a new trial.

STEPHENS, C.J., and LEIBSON, J., join in this dissent.