Jerry COLLINS, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 96–SC–578–MR.

Supreme Court of Kentucky.

May 22, 1997.

As Modified Sept. 4, 1997.

Case Ordered Published Sept. 4, 1997.

Daniel F. Dotson, Whitesburg, for Appellant.

A.B. Chandler III, Attorney General, Carol Ullerich, Criminal Appellate Division Office of the Attorney General, Frankfort, for Appellee.

GRAVES, Justice.

Appellant was convicted in the Letcher Circuit Court of the first-degree rape, second-degree rape, second-degree sodomy, incest and first-degree wanton endangerment of his stepdaughter, L.T. He was sentenced to life imprisonment. Appellant appeals to this Court as a matter of right. We have carefully reviewed the record and, finding no error, affirm the judgment and sentence.

The victim, L.T., testified that Appellant had sexually abused her from 1988 to 1992, when she was between the ages of nine to fifteen years old. L.T. stated that Appellant had forced her to engage in sex at least one hundred times during this period. The abuse occurred in the family home, as well as in a trailer at Appellant's job site. Appellant practiced coitus interruptus and ejaculated either into a towel or underwear. L.T. testified that Appellant kept a towel hidden between the mattress and box springs in his bedroom for such purpose.

Appellant was arrested in 1993 when L.T., after reading a magazine article describing a similar ordeal endured by another girl, divulged the abuse. Shortly thereafter, L.T.'s mother discovered a soiled towel between the mattress and box springs of Appellant's bed. Upon mentioning the towel to a deputy sheriff and two social service employees, the mother placed the towel into a plastic bag, pursuant to their instructions, and put the bag in a closet for safe keeping. The towel was never collected and was subsequently lost.

Prior to trial, Appellant filed a motion to compel production of the test results on the towel. Due to a reference in the grand jury transcript, counsel mistakenly believed that the towel had, in fact, been collected and tested. Upon discovering that such had not occurred, Appellant filed a motion in limine to exclude all reference to the towel. Although testimony concerning the towel was ultimately admitted at trial, Appellant was given a missing evidence instruction.

Only three witnesses testified during the Commonwealth's case in chief: L.T., her mother, and Dr. Artie Bates, who testified both as L.T.'s treating physician and as an expert on the physical aspects of child sexual abuse cases. The jury convicted Appellant of three counts of first-degree rape, three counts of second-degree rape, four counts of second-degree sodomy, one count of first-degree wanton endangerment, and incest. Appellant was sentenced to life imprisonment. Appellant's motions for a judgment N.O.V. and new trial were denied, and this appeal ensued. Additional facts will be developed as necessary in the course of this opinion.

## COMMONWEALTH'S FAILURE TO COLLECT THE TOWEL

Appellant argues that the Commonwealth's failure to collect and preserve the towel violated his right to due process and fundamental fairness under the Kentucky Constitution. Appellant relies primarily on this Court's opinion in *Tamme v. Commonwealth*, Ky., 759 S.W.2d 51 (1988), in which we stated:

Appellant further contends that it was reversible error for the prosecution to have lost one of the bullets found at the scene. He argues that the loss is inexcusable and renders the fact-finding of the prosecution skewed and perverted.... In order to establish a due process violation, the evidence must be either intentionally destroyed, or destroyed inadvertently outside normal practices. Furthermore, the lost evidence must "possess an exculpatory value that was apparent before it was destroyed." *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984). Appellant has failed to satisfy this test. He has not proven

that the loss was anything but an unforeseen accident which occurred in the normal course of the police department's business and there is no indication that the lost bullet would tend to clear him.

*Id.* at 54.

It is Appellant's contention that the towel was lost "outside normal practices" of the police department. Shortly after *Tamme* was decided, the United States Supreme Court rendered *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). The factual scenario resembles the present case in that the State failed to refrigerate the victim's clothing for the purposes of preserving it for semen tests, as well as failed to properly preserve semen samples which were collected. In holding that no due process violation occurred, the Court stated:

> [T]he Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than it could have been subjected to tests, the results of which might have exonerated the defendant.... We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process.

*Id.* at 57–58, 109 S.Ct. at 337.

■ The rationale in *Youngblood* marked a departure from the Supreme Court's previous decision in *Trombetta, supra,* which was the basis for this Court's opinion in *Tamme, supra.* The Court noted that *Trombetta* in-

volved evidence whose exculpatory value was "apparent." In *Youngblood,* however, respondent could not demonstrate that "police knew the semen samples would have exculpated him when they failed to perform certain tests or to refrigerate the boy's clothing; this evidence was simply an avenue of investigation that might have led in any number of directions." *Id.* at 56, note 2, 109 S.Ct. at 336, note 2. The Court concluded that a showing of bad faith is requisite to finding a due process violation. *Id.* at 58, 109 S.Ct. at 337.

Appellant urges this Court to reject the bad faith approach of *Youngblood* in favor of a balancing test simply because Section 2 of the Kentucky Constitution[1] uses different wording from that of the federal Due Process Clause[2]. It is the slight variation in language which leads Appellant to the conclusion that Section 2 provides more expansive rights. In support, Appellant cites several decisions from other jurisdictions holding that the negligent loss of evidence violates state constitutional protections even if the degree of bad faith necessary to satisfy the *Youngblood* test is absent. *State v. Morales,* 232 Conn. 707, 657 A.2d 585 (1995); *State v. Delisle,* 162 Vt. 293, 648 A.2d 632 (1994); *Ex Parte Gingo,* 605 So.2d 1237 (Ala.1992).

Appellant states that no Kentucky decision has dealt with the issue of lost evidence since *Tamme, supra,* and therefore we have not actually adopted the bad faith requirement. However, the Kentucky Court of Appeals cited *Youngblood* with favor in *Allen v. Commonwealth,* Ky.App. 817 S.W.2d 458 (1991), and this Court has recognized and applied the bad faith analysis in *Johnson v. Commonwealth,* Ky., 892 S.W.2d 558 (1994) and *Perdue v. Commonwealth,* Ky., 916 S.W.2d 148 (1995).

We realize that there are two striking differences between the present case and prior decisions. First, unlike the prior cases

---

1. § 2 of the Kentucky Constitution states, "Absolute and arbitrary power over the lives, liberty and property of freemen exits nowhere in a republic, not even in the largest majority."

2. The Fourteenth Amendment to the U.S. Constitution states, in part, "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

in which evidence was properly collected but ultimately destroyed or lost, the Commonwealth in this instance never came into possession of the towel. Second, because the Commonwealth in the prior cases initially had the evidence in question, documentation and test results were provided to the defense even though the actual evidence was no longer in existence. Thus, this is a case of first impression in that this Court has not previously been presented with a situation in which the Commonwealth failed to *collect* evidence. However, we are of the opinion that this may be a distinction without a difference.

■ The Commonwealth concedes, and we agree, that it was negligent in failing to collect and preserve the towel. Nonetheless, mere negligence simply does not rise to the level of bad faith required by *Youngblood, supra*. Appellant cannot substantiate any ill motive or intention on the part of the Commonwealth in failing to collect the towel. Further, even if we were to apply the rationale set forth in *Tamme, supra* and *Trombetta, supra*, Appellant is unable to prove that the towel possessed "an exculpatory value that was apparent before it was destroyed." *Tamme*, 759 S.W.2d at 54. Indeed, it is more likely that the towel would have been useful to the Commonwealth. Had the towel tested positive for Appellant's semen, the evidence would have further corroborated L.T.'s testimony and strengthened the Commonwealth's case. Conversely, had the towel tested negative, such information alone could not have exonerated Appellant. Jurors could have easily concluded that it was not the same towel L.T. described, or that it had been laundered. Moreover, since the acts occurred in various locations, it would not have been unreasonable for jurors to believe that there was more than one towel.

■ Another factor of critical importance to this case is the missing evidence instruction that was provided. The trial judge instructed the jury:

> If you believe from the evidence that there existed a towel and that the agents or employees of the Commonwealth allowed the towel to be destroyed without making any effort to obtain and test same, you

may, but are not required to, infer that the towel would be, if available, adverse to the Commonwealth and favorable to the Defendant.

As a result, any uncertainty as to what the towel might have proved was turned to Appellant's advantage. Giving such an instruction provided Appellant "more than the process due." *Arizona v. Youngblood*, 173 Ariz. 502, 844 P.2d 1152, 1157 (1993).

The Commonwealth's failure to collect and preserve the towel clearly constituted negligence. However, Appellant has failed to demonstrate that such amounted to bad faith under the standard recognized in this Commonwealth. Thus we cannot conclude that Appellant was denied due process under the law.

### TESTIMONY OF DR. ARTIE BATES

Appellant next challenges the testimony of the Commonwealth's expert, Dr. Artie Bates. Appellant's argument is twofold. First, he contends that the Commonwealth violated a discovery order by failing to provide all medical articles and research upon which Dr. Bates relied. Second, Appellant claims the trial court erred in allowing Dr. Bates's expert testimony.

Dr. Bates conducted the medical exam on L.T. and documented in her report that L.T. still had a hymen. The report extensively delineated the physical findings and described in detail the characteristics of L.T.'s hymen. Dr. Bates concluded that her findings were indicative of sexual abuse. In accordance with the discovery order, the Commonwealth provided Appellant a copy of the report.

Dr. Bates testified as both L.T.'s treating physician and an expert in the physical aspects of child sexual abuse cases, particularly involving young females. Dr. Bates stated that in addition to her general medical training, she had performed over two thousand pelvic exams on young women. She stated that although there is no recognized specialty in child sexual abuse in Kentucky, she had completed all available training and remained current on all publications and information available in the area. In addition, Dr. Bates

testified that she participated in monthly review sessions with other physicians specializing in child sexual abuse cases. As such, the court qualified her as an expert.

Dr. Bates testified as to the contents of her report and her conclusion that L.T. had been sexually abused despite the fact the hymen was still present. Over defense objection, she further stated that it was not uncommon for women who have had numerous sexual encounters to still have a hymen. In fact, Dr. Bates commented that approximately fifty percent of the sexually active women she examined retained a hymen. She stated that her opinion was based upon her experience with pelvic examinations, as well as extensive medical research she had studied. On cross-examination, Dr. Bates again referred to numerous studies which debunked the theory that the hymen is destroyed after the first sexual encounter. At no point during her testimony did the defense elicit the names of these studies or question their veracity and general acceptability.

Appellant first contends that Dr. Bates's testimony should have been prohibited because the Commonwealth violated the discovery order when it failed to provide all of the research and literature she relied upon in stating her expert opinion. Appellant argues that this omission by the Commonwealth left him ill-prepared to counter Dr. Bates's testimony that sexual intercourse does not destroy the hymen. The Commonwealth points out that Appellant did not allege a discovery violation until his motion for new trial, and argues that this issue should be deemed unpreserved for review.

■ Nonetheless, we do not find any merit in Appellant's claim. RCr 7.24(1)(b) requires, upon defense request, the disclosure of any "results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case, or copies thereof, that are known by the attorney for the Commonwealth to be in possession, custody or control of the Commonwealth." In conformity with this rule, the Commonwealth provided Appellant a copy of Dr. Bates's report.

The studies referred to by Dr. Bates were not made in connection with the present case. Further, there is no requirement that an expert tender each and every article or study upon which an opinion is based. In fact, Kentucky Rule of Evidence 705 states, in part, that "an expert may testify in terms of opinion or inference and give reasons thereof without prior disclosure of the underlying facts or data, unless the court requires otherwise." The Commonwealth was not required under either the discovery order or the criminal rules to provide Appellant with all of Dr. Bates's reading material.

Moreover, we cannot accept Appellant's contention that he was unduly surprised by Dr. Bates's testimony. Her report clearly stated that L.T. had a hymen. Further, Dr. Bates concluded that the physical examination, in conjunction with the history L.T. provided, was indicative of sexual abuse. Reading the report in its entirety, Appellant could only have concluded that Dr. Bates was of the opinion that a female could engage in sexual intercourse and still have a visible hymen. It is further evident that Appellant was cognizant of Dr. Bates's testimony in that he presented an expert to rebut her opinion.

■ Appellant also challenges the substance of Dr. Bates's testimony on the grounds that it did not satisfy the test set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Daubert* provides that when faced with a proffer of expert scientific testimony, the trial court must determine at a preliminary hearing "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592, 113 S.Ct. at 2796. The *Daubert* decision was based upon the Supreme Court's interpretation of Federal Rule of Evidence 702, and overruled the prior standard set forth in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). Kentucky Rule of Evidence 702 contains the same language as its federal counterpart, and provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a

fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

This Court adopted the *Daubert* analysis in *Mitchell v. Commonwealth*, Ky., 908 S.W.2d 100 (1995). The *Mitchell* opinion discusses the factors a lower court should consider in determining the admissibility of expert scientific testimony, including whether the theory or technique can be tested; whether it has been subjected to peer review; whether it has been generally accepted; and the known or potential rate of error. *Id.* at 102.

■ Having articulated that Kentucky follows the *Daubert* analysis for the admissibility of scientific evidence, we conclude that such analysis is not, in fact, triggered in this case. *Daubert* and *Mitchell* use the catch phrases "expert scientific testimony", "theory", "technology", and "methodology". Dr. Bates's testimony, on the other hand, concerned basic female anatomical findings. Her examinations did not involve any novel scientific techniques or theories. Likewise, the research that Dr. Bates referred to involved the study of a female physical characteristic. Dr. Bates testified that the studies she relied upon were compilations of statistics derived from pelvic examinations of young females in various age groups. We discern nothing of a scientific nature to trigger the necessity of applying the *Daubert* analysis.

■ In accordance with KRE 702, Dr. Bates was qualified as an expert based upon her knowledge, experience and training. Her testimony clearly assisted the trier of fact to understand a fact in issue, i.e., the presence of a hymen in a female who has been sexually active. The trial court did not abuse its discretion in allowing Dr. Bates's expert testimony.

### HEARSAY TESTIMONY OF THE SOCIAL WORKER

Appellant argues that the trial court erred in permitting hearsay testimony from a social worker, Charlotte Trent, about L.T.'s explanation for her initial denial of the sexual abuse. We disagree. During L.T.'s testimony, she stated that Trent had spoken with her in 1992 about any possible abuse. L.T. testified that at that time she told Trent that Appellant was not sexually abusing her.

Subsequently, Appellant called Trent as his first witness, who reiterated the contents of her 1992 report. On cross-examination, Trent further stated that she spoke with L.T. again after Appellant's arrest. Appellant objected and moved to exclude any conversations between Trent and L.T. after Appellant's arrest. Following a hearing in chambers, the court concluded that Appellant's emphasis on L.T.'s prior inconsistent statement made the explanation given to Trent relevant. Thus, finding that Appellant had opened the door, the court permitted Trent to testify that L.T. told her she had lied in 1992 because Trent was a stranger and L.T. did not want to wreck her mother's life. L.T. also told Trent that she did not divulge the abuse out of fear that Appellant would kill her mother and brother.

■ Appellant contends that Trent's testimony as to L.T.'s statements was inadmissible hearsay. Appellant correctly notes that no exception to the rule against hearsay exempts "social workers or the results of their investigations." *Souder v. Commonwealth*, Ky., 719 S.W.2d 730, 734 (1986). However, we are unaware of a rule which would exclude evidence otherwise admissible simply because the witness is a social worker.

■ In *Cabinet for Human Resources v. E.S.*, Ky., 730 S.W.2d 929 (1987), we held that factual observations, as distinguished from opinions and conclusions, expressed in a social worker's report were admissible under the business records exception to the hearsay rule. This exception encompasses Trent's testimony as well, because she only testified as to a factual observation, L.T.'s explanation, which was given to her. At no point did Trent testify as to whether she believed L.T. either in 1992 or after Appellant's arrest.

■ Finally, Appellant cannot demonstrate that he was prejudiced by Trent's testimony. When L.T. testified, she admitted to lying to Trent in 1992, and provided an explanation as to why she did so. Therefore,

Trent's testimony, which Appellant argues should not have been admissible, was merely cumulative of the testimony L.T. had previously given. *Cavins v. Commonwealth*, Ky., 639 S.W.2d 766 (1982). No reversible error occurred.

### DENIAL OF MOTIONS FOR NEW TRIAL

Appellant argues that the trial court abused its discretion in denying his requests for a new trial based upon newly discovered evidence. Prior to trial, Appellant interviewed Jeremy Cimano, an eighteen year old young man who stated that he had engaged in sexual intercourse with L.T. approximately ten times. Cimano was subpoenaed to testify but was released by the defense prior to Dr. Bates's testimony. Similarly, following the trial, Andy Yonts also claimed that he had intercourse with L.T. in 1992. Appellant states that the Cimano and Yonts testimony was relevant to impeach L.T.'s claim that she had never had sexual intercourse with anyone except Appellant.

Appellant acknowledges that he was apprised of Cimano's allegations prior to trial. Yet, he contends that if he had been aware of the nature of Dr. Bates's testimony, he would not have released Cimano. Therefore, he concludes that because his "failure to call Cimano as a trial witness is a direct function of the Commonwealth's violation of RCr 7.24, the Cimano testimony should have been treated as new evidence, the particulars of which would have justified a new trial."

RCr 10.02 permits a trial court to grant a new trial for any cause which prevented the defendant from having a fair trial, or if required in the interest of justice. Granting a new trial is within the discretion of the trial court, and such is disfavored when the grounds are newly discovered evidence which is merely cumulative or impeaching in nature. *Epperson v. Commonwealth*, Ky., 809 S.W.2d 835 (1990). Newly discovered evidence "must be of such decisive value or force that it would with reasonable certainty, change the verdict or that it would probably change the result if a new trial should be granted." *Coots v. Commonwealth*, Ky., 418 S.W.2d 752, 754 (1967).

Further, a motion for new trial based upon newly discovered evidence must be accompanied by an affidavit showing that Appellant exercised sufficient diligence to obtain the evidence prior to his trial. *Wheeler v. Commonwealth*, Ky., 395 S.W.2d 569 (1965).

Appellant concedes that he knew in advance of trial about Cimano's allegations. The decision to release Cimano was purely trial strategy. Appellant cannot now be heard to complain of such a decision. Further, we do not perceive either Cimano's or Yonts's allegations to be of such a decisive quality as to change the outcome of the case. The testimony of either would do nothing other than denigrate L.T.'s reputation. Even if the allegations are taken as true, they do not change the fact that Appellant sexually abused L.T. The trial court did not abuse its discretion in denying the requests for a new trial.

For the reasons set forth herein, the judgment and sentence of the Letcher Circuit Court is affirmed.

COOPER, GRAVES, JOHNSTONE, LAMBERT, STUMBO and WINTERSHEIMER, JJ., concur.

STEPHENS, C.J., dissents without an opinion.