# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: DECEMBER 19, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0442-MR

SCOTT HURLEY                                              APPELLANT

|  |  |  |
|---|---|---|
| V. | ON APPEAL FROM PIKE CIRCUIT COURT<br>HONORABLE EDDY COLEMAN, JUDGE<br>NO. 23-CR-00249 |  |

COMMONWEALTH OF KENTUCKY                              APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

A Pike County jury found Scott Hurley ("Hurley") guilty of first-degree fleeing or evading police; tampering with physical evidence; first-degree trafficking in a controlled substance, two or more grams of methamphetamine; first-degree trafficking in a controlled substance, fentanyl; and being a first-degree persistent felony offender. The Pike Circuit Court thereafter sentenced Hurley to twenty years in prison. Hurley now appeals as a matter of right and challenges his convictions. *See* KY. CONST. § 110(2)(b). Having reviewed the record, the arguments of the parties, and the applicable law, we affirm the Pike Circuit Court.

## I. BACKGROUND

On July 4, 2022, at approximately 2:30 a.m., Officer Larry Thacker of the Pikeville Police Department was parked on the median of U.S. Route 23 when

he observed Hurley drive past him going southbound at approximately seventy miles per hour in a red Mitsubishi Galant. The posted speed limit for this stretch of road was fifty-five miles per hour. As a result, Officer Thacker activated his lights and siren and pursued Hurley. Hurley continued at seventy miles per hour for about three quarters of a mile before slowing down, maneuvering onto a turning lane, and exiting the highway onto KY 3496.

The exit onto KY 3496 is a tight hairpin turn that takes travelers in the opposite direction toward Downtown Pikeville. Upon maneuvering onto the hairpin turn of KY 3496, Hurley's two passenger-side wheels dropped onto the gravel shoulder. Officer Thacker testified that it was at this point that he observed Hurley throw a white object out the passenger-side window. Officer Thacker was approximately fifteen to twenty feet behind Hurley's vehicle when he noticed the object fly toward the post of a KY 3496 road sign. However, because Hurley continued driving down KY 3496, Officer Thacker was forced to abandon the opportunity to examine the potential evidence and continue pursuing Hurley. Officer Thacker radioed to his fellow officers, Officer Patrick Coleman and Sergeant Sonny Buckley, for backup.

Hurley then drove on the wrong side of KY 3496 for approximately a couple hundred feet before turning into the parking lot of a local restaurant. Both vehicles then came to a stop, and Officer Thacker instructed Hurley to stay in his car. Hurley exited his vehicle anyway and walked toward Officer Thacker. Officer Thacker testified that Hurley was "acting very jittery—very— like he was almost on a stimulant." Officer Thacker then arrested Hurley and

placed him in the back of his patrol vehicle. Officer Coleman and Sergeant Buckley then arrived on the scene, and Officer Thacker pointed his flashlight toward the KY 3496 road sign where he believed the white object might be located.

Officer Coleman testified that he walked straight toward the road sign from the restaurant parking lot and retrieved a white grocery bag matching Officer Thacker's description. Both Officer Thacker and Officer Coleman testified that although it was the middle of the night, this area was well-lit by streetlights. Officer Coleman further testified that there were no other grocery or shopping bags in that vicinity, nor was there any garbage around where the white bag appeared to land. The white grocery bag contained two small clear packages. One package contained what was later confirmed to be 199.7 grams of a crystalline substance containing methamphetamine, and the other 4.8574 grams of a powdery substance containing fentanyl and flurofentantyl.

Following his arrest, Hurley declined Officer Thacker's invitation to take a sobriety test. Officer Thacker thereafter placed the two packages of drugs on the passenger-side floorboard of his vehicle, and transported Hurley to the Pike County Detention Center ("PCDC"). Officer Thacker and Hurley arrived at PCDC at 3:16 a.m. Officer Thacker completed Hurley's arrest citation inside the PCDC sallyport before bringing Hurley inside at 4:05 a.m.

Lieutenant Ryan Hicks is a lieutenant at the PCDC. Part of Lieutenant Hicks's role at the PCDC is facilitating the arrestee booking process. Lieutenant Hicks testified that while it is not his usual practice to help an officer with an

3

arrestee in the sallyport, he did so with Officer Thacker on the night in question. Lieutenant Hicks could not remember why exactly he went to help Officer Thacker at the sallyport, but he speculated that it was because Hurley was being combative. Lieutenant Hicks explained that it can be hard for an officer to focus and fill out the arrest citation with a combative arrestee in the vehicle, so when that is the case, he will go to the sallyport and attempt to calm the arrestee down.

While at the sallyport, Lieutenant Hicks noticed the two packages of drugs seized by Officer Thacker and took photographs of the drugs with his cell phone because it was the largest drug seizure he had ever seen. At trial, Lieutenant Hicks could not remember the exact location of the drugs at the time he took the photograph. Specifically, he testified that "I'm thinking it may have been the hood [of Officer Thacker's vehicle], but I'm not sure." Lieutenant Hicks further testified that his cell phone broke a few months after the incident, so he no longer has access to any photographs he took of the drugs.

Officer Thacker, on the other hand, testified that the drugs remained on the front, passenger-side floorboard of his vehicle the entire time. The PCDC maintains video surveillance of the sallyport, but only stores the footage for twelve days. As a result, the footage from the present incident was unavailable for review by the parties.

The jury found Hurley guilty of first-degree fleeing or evading police; tampering with physical evidence; first-degree trafficking in a controlled substance, two or more grams of methamphetamine; first-degree trafficking in

4

a controlled substance, fentanyl; and being a first-degree persistent felony offender. Hurley's stipulations to his prior convictions served as the basis for his status as a first-degree persistent felony offender.[1] In turn, the jury recommended a total sentence of twenty years in prison, and the trial court sentenced Hurley consistently with that recommendation. This appeal followed.

## II. ANALYSIS

On appeal to this Court, Hurley alleges the trial court made four errors, each of which requires reversal. First, he alleges that the trial court erred when it overruled his motion for a directed verdict of acquittal on the charge of tampering with physical evidence. Second, Hurley argues that the trial court also erred when it overruled his motion for a directed verdict of acquittal on the charge of fleeing or evading police in the first degree. Third, he alleges that the testimony of the Commonwealth's expert witness, Detective Austin King, was irrelevant and amounted to palpable error. Finally, Hurley argues that the trial court erred when it denied his request for a missing evidence instruction. We address each of Hurley's arguments in turn.

### A. The trial court properly overruled Hurley's motions for directed verdicts of acquittal.

Hurley argues that he was entitled to directed verdicts of acquittal on his tampering with physical evidence and first-degree fleeing or evading police

---

[1] Specifically, Hurley stipulated to his prior convictions for first-degree burglary, first-degree promoting contraband, possession of a controlled substance, and two prior convictions for second-degree burglary.

5

charges. We hold that the trial court did not err and affirm Hurley's convictions as to these charges.

### 1. Directed Verdict Standard

This Court clearly stated the standard for directed verdicts in *Commonwealth v. Benham*:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

816 S.W.2d 186, 187 (Ky. 1991). "So long as the Commonwealth produces more than a mere scintilla of evidence to support the charges, a defendant's motion for directed verdict should be denied." *Taylor v. Commonwealth*, 617 S.W.3d 321, 324 (Ky. 2020). "On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Benham*, 816 S.W.2d at 187.

### 2. Tampering with Physical Evidence

Under KRS 524.100(1)(a), a defendant "is guilty of tampering with physical evidence when . . . [he] destroys, mutilates, conceals, removes or alters physical evidence." Furthermore, as for the required mental state, "the Commonwealth satisfies the intent element by showing beyond a reasonable doubt that the defendant acted with 'the intent to impair [the evidence's] verity

6

or availability in the official proceeding.'" *Commonwealth v. James*, 586 S.W.3d 717, 725 (Ky. 2019) (citing KRS 524.100).

Here, Hurley contends that the Commonwealth failed to produce sufficient evidence to support a conviction for tampering with physical evidence. Specifically, Hurley argues that his throwing of the grocery bag (containing the methamphetamine and fentanyl) out the passenger-side window of his car in the midst of a vehicular pursuit did not constitute either a concealment or removal of evidence under KRS 524.100(1)(a). We disagree.

In *Commonwealth v. James*, we addressed whether a defendant "conceals" or "removes" evidence under the tampering statute when he "in plain view of an officer, drops or tosses away evidence of a possessory crime in a manner that makes the evidence easily retrievable by law enforcement." *Id.* There, a Kentucky State Police narcotics detective was investigating reports of possible drug activity at a residence when he noticed the defendant walking toward the target residence. *Id.* at 719. The defendant noticed the detective and changed direction to walk down an alley. *Id.* at 720. The detective observed the defendant discard multiple items from his waistband before eventually arresting the defendant and returning to the location to retrieve what was later confirmed to be a glass pipe containing methamphetamine. *Id.*

This Court ultimately held that the defendant in *James* had neither concealed nor removed the glass pipe within the meaning of KRS 524.100 because his abandonment of the evidence was done in the direct view of law enforcement and occurred "in a manner that left the evidence easily

7

retrievable." *Id.* at 729. Accordingly, the rule we articulated in *James* was twofold: "where a defendant merely drops, throws down, or abandons evidence [(1)] in the vicinity of the defendant and in the presence and view of the police, and [(2)] the officer can quickly, safely, and readily retrieve the evidence, the criminal act of concealment or removal has not taken place." *Id.* at 731. Importantly, we also emphasized that KRS 524.100 involves a case-specific inquiry. *Id.* Thus, efforts to conceal or remove physical evidence in the presence of police may still form the basis for a tampering conviction:

> We caution, however, that the dropping or tossing away of evidence in the presence of a law enforcement officer, even when the drugs are eventually recovered, is not always outside the reach of the tampering statute. In some scenarios, the affirmative act of dropping or throwing away the evidence even in the presence of law enforcement officers may constitute a violation of the statute, depending on the specific facts of the case. For example, *where the tossing away of evidence makes the evidence "substantially more difficult or impossible" for law enforcement to recover and use in a later proceeding against the defendant, the act may result in concealment, even if the officers ultimately succeed in retrieving the evidence.*

*Id.* (emphasis added).

In the case before us, *James* does not compel the result that Hurley seeks. Here, Hurley threw the bag containing methamphetamine and fentanyl out his passenger-side window in the midst of a high-speed vehicular pursuit. The evidence was thus necessarily located outside Hurley's vicinity and the immediate presence of Officer Thacker. Furthermore, Hurley did not stop his vehicle in the same spot where the drugs ultimately landed. Instead, Hurley pulled into a parking lot farther down the road, and Officer Thacker was forced

8

to first secure and arrest Hurley before informing his back-up officer, Officer Coleman, of the general direction where the evidence may be located.

Accordingly, this is not a case in which Hurley "merely abandoned" evidence in the direct view of Officer Thacker. Instead, Hurley threw the drugs outside his vehicle during a dangerous, high-speed pursuit and purposefully placed the evidence outside Officer Thacker's presence. Furthermore, the mere fact that Officer Coleman "ultimately succeed[ed] in retrieving the evidence" does not change the fact that Hurley's actions made such recovery "substantially more difficult." *James*, 586 S.W.3d at 731. As a result, the Commonwealth clearly produced "more than a mere scintilla of evidence to support the charge[]" under KRS 524.100, and we see no error in the trial court's denial of Hurley's motion for a directed verdict on this matter. *Taylor*, 617 S.W.3d at 324.

### 3. First-Degree Fleeing or Evading Police

In relevant part, KRS 520.095(1)(a) provides that an individual is guilty of fleeing or evading police in the first degree:

(1) When, while operating a motor vehicle with intent to elude or flee, the person knowingly or wantonly disobeys a direction to stop his or her motor vehicle, given by a person recognized to be a police officer, and at least one (1) of the following conditions exists:
. . .
2. The person is driving under the influence of alcohol or any other substance or combination of substances in violation of KRS 189A.010; [or]
. . .
4. By fleeing or eluding, the person is the cause, or creates substantial risk, of serious physical injury or death to any person or property[.]

9

Hurley first argues that the Commonwealth failed to prove that he was operating his vehicle under the influence of a prohibited substance under KRS 189A.010, one of the potential preconditions for liability for first-degree fleeing and evading police. Specifically, Hurley raises two arguments. First, he notes the fact that he was acquitted on his operation of a motor vehicle under the influence of intoxicants charge. Second, Hurley then alleges that Officer Thacker's testimony concerning his demeanor and conduct was insufficient to support a finding of guilt under this charge.

Hurley alleges that his acquittal on the operation of a motor vehicle under the influence of intoxicants charge supports his argument that there was insufficient evidence to induce a juror to believe beyond a reasonable doubt that he was operating his vehicle under the influence of a prohibited substance. However, we note that jury verdicts need not be consistent, and our analysis is constrained solely to whether there was sufficient evidence to sustain each individual conviction. *Commonwealth v. Harrell*, 3 S.W.3d 349 (Ky. 1999); *see also Exantus v. Commonwealth*, 612 S.W.3d 871, 882 (Ky. 2020) (holding that consistent verdicts are not required because "the only inquiry on review [is] whether there was sufficient evidence to support an individual conviction"). Accordingly, we see no merit in this argument.

Additionally, Hurley argues that Officer Thacker's testimony alone was insufficient to support a finding of guilt under the precondition relating to operation of a motor vehicle under the influence of intoxicants. However, "[o]ur courts have long held that a jury is free to believe the testimony of one witness

10

over the testimony of others." *Minter v. Commonwealth*, 415 S.W.3d 614, 618 (Ky. 2013). "The testimony of a single witness is enough to support a conviction." *Id.* at 618 (citing *Gerlaugh v. Commonwealth*, 156 S.W.3d 747, 758 (Ky. 2005)). Further, "[t]he testimony of even a single witness is sufficient to support a finding of guilt, even when other witnesses testified to the contrary if, after consideration of all of the evidence, the finder of fact assigns greater weight to that evidence." *Commonwealth v. Suttles*, 80 S.W.3d 424, 426 (Ky. 2002).

The Commonwealth relied on Officer Thacker's testimony to prove that Hurley was driving under the influence of a prohibited substance. Officer Thacker testified that Hurley's appearance and behavior led him to believe Hurley was intoxicated. Specifically, Officer Thacker observed that, "It was his actions, how intense, how much energy he had, how much he wouldn't shut up, how much he kept on talking. He was just very hyper." Here, under the evidence presented, it would not "be clearly unreasonable for a jury to find guilt." *Benham*, 816 S.W.2d at 187.

Next, Hurley argues that the Commonwealth also failed to prove that he created a substantial risk of serious physical injury or death to any person or property, the second of the two potential preconditions for liability for first-degree fleeing and evading police, when he fled from Officer Thacker.

Whether substantial risk of serious physical injury occurred "turns on the unique circumstances of an individual case." *Cooper v. Commonwealth*, 569 S.W.2d 668, 671 (Ky. 1978). Generally, "a substantial risk is a risk that is

11

'[a]mple, considerable in … degree … or extent,' and '[t]rue or real; not imaginary.'" *Bell v. Commonwealth*, 122 S.W.3d 490, 497 (Ky. 2003) (internal citations omitted). Where the substantial risk of serious physical injury involves operation of a motor vehicle, our analysis necessarily "requires consideration of the manner in which a vehicle is operated and the conditions under which that vehicle is operated." *Culver v. Commonwealth*, 590 S.W.3d 810, 817 (Ky. 2019). For example, it may be enough to establish a substantial risk of serious physical injury where the defendant's speeding is paired with other factors such as:

> disobeying stop signs and red lights; inclement weather; and circumstances in which other vehicles and pedestrians are at risk of serious physical injury indicated by the need to get out of the defendant's way, or likely to be put at such risk, such as in congested areas with schools and shopping centers[.]

*Id.*

Under the facts of this case, there was sufficient evidence to show that it was not clearly unreasonable for the jury to find that the substantial risk element of KRS 520.095(a)(4) was satisfied. While there were no other cars on the highway and no one else in Hurley's vehicle, Hurley still drove seventy miles per hour on a fifty-five-mile-per-hour road. In addition to speeding, Hurley was also driving erratically. He abruptly turned onto KY 3496 at such a high rate of speed that he lost control of his vehicle and momentarily swerved off the road. Following this loss of control, Hurley then drove on the wrong side of KY 3496 before eventually turning into a restaurant parking lot. Thus, evidence of Hurley's reckless driving and his speeding indicate that it was not

12

clearly unreasonable for the jury to find that the substantial risk element of KRS 520.095(a)(4) was satisfied.

As stated earlier, under Kentucky's directed verdict standard, in order for a jury to consider a criminal charge, more than a scintilla of evidence must be adduced from which a reasonable juror could conclude a defendant is guilty. *Taylor*, 617 S.W.3d at 324. That standard is more than satisfied in this case. The Commonwealth clearly presented more than a mere scintilla of evidence concerning KRS 520.095(a)(2) and KRS 520.095(a)(4) such that a reasonable juror could conclude that Hurley was guilty of first degree fleeing or evading police on either condition. Accordingly, the trial court did not err in denying Hurley's motion for a directed verdict on this charge.

## B. Testimony of Detective Austin King

Third, Hurley argues that Detective Austin King's testimony concerning the dangerousness and purity of the drugs that Hurley was alleged to traffic was irrelevant and unduly prejudicial. Hurley did not object to any of this testimony at trial. Thus, the issue is unpreserved for appeal, and we review for palpable error pursuant to RCr[2] 10.26.

Under RCr 10.26, if an unpreserved error is found to be palpable and if it affects the substantial rights of the defendant, the appellate court may grant appropriate relief if manifest injustice has resulted from the error. An error is palpable when it is "easily perceptible, plain, obvious and readily noticeable."

---

[2] Rules of Criminal Procedure

13

*Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006). "When an appellate court engages in a palpable error review, its focus is on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Martin v. Commonwealth*, 207 S.W.3d 1, 5 (Ky. 2006).

The Commonwealth presented Detective King's expertise in narcotics trafficking to distinguish between evidence of drug trafficking and evidence of drug use. Hurley does not dispute the admissibility of this line of questioning, but instead takes issue with two aspects of Detective King's testimony. First, he argues that Detective King's testimony concerning the dangerousness of the drugs was irrelevant and unduly prejudicial. At trial, when asked to examine the drug exhibits presented by the Commonwealth, Detective King wore a pair of gloves. The Commonwealth inquired whether this was his standard practice, to which Detective King explained that he did so because of the danger of exposure, which is especially prevalent when dealing with fentanyl. The particular line of questioning occurred as follows:

> **Commonwealth**: Is it your training to always wear gloves when possible when dealing with controlled substances?
> **Detective King**: Yes.
> **Commonwealth**: Why is that?
> **Detective King**: The danger of them, the exposure.
> **Commonwealth**: Is there a particular one that you're worried about being exposed to?
> **Detective King**: The one I worry about the most is fentanyl and, typically, if I deal with fentanyl, it'll be gloves and a face mask of some sort, especially if it's exposed. If it's already packaged then, typically, just gloves.
> **Commonwealth**: What is the increased risk of fentanyl?

14

**Detective King**: Fentanyl is extremely dangerous. Of course, it's up to 50 times stronger than heroin and up to 100 times stronger than morphine so just the slight inhalation of fentanyl in the air can cause an overdose, especially to someone who doesn't have an opioid tolerance.

In addition to this line of questioning, Hurley also objects to Detective King's testimony concerning the probable origin of the methamphetamine involved in this case and its purity level. At trial, Detective King testified that the methamphetamine possessed by Hurley was likely manufactured in Mexico and created in a sophisticated lab setting because it was "more crystal-like" in appearance.

We begin by noting that relevancy is a low bar. *Hall v. Commonwealth*, 468 S.W.3d 814, 832 (Ky. 2015). Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. KRE 401. Further, all relevant evidence is admissible unless excluded by constitution, statute, or rule. KRE 402.

Where a defendant is charged with trafficking in a particular drug, expert testimony concerning the mechanics and characteristics specific to that drug trade may be useful to the jury in understanding the evidence. *Sargent v. Commonwealth*, 813 S.W.2d 801, 802 (Ky. 1991). We applied this rule in *Burdell v. Commonwealth*, where we permitted a police narcotics expert to testify to "the relative commercial value of powder and crack cocaine, how crack cocaine is manufactured, and the methods for preparation and inhalation of both powder and crack cocaine." 990 S.W.2d 628, 634 (Ky. 1999).

15

We held that this testimony was relevant "to help the jury understand the nature and uses of cocaine and tended to prove that Appellant possessed the cocaine for the purpose of sale." *Id.*

In this case, Detective King's testimony concerning the dangerousness of the drugs served merely to provide context to his use of gloves in handling the exhibits. Furthermore, the testimony relating to the purity and origin of the methamphetamine provided a frame of reference for the jury in placing Hurley's possession of the drugs in the larger manufacture-to-use chain. The testimony tended to make it more probable that Hurley possessed the drugs with the intent to distribute them rather than mere possession for personal use. We perceive no "easily perceptible, plain, obvious [or] readily noticeable" error present. *Brewer*, 206 S.W.3d at 349 (Ky. 2006). As a result, we conclude that no palpable error occurred.

### C. Missing Evidence Instruction

Finally, we turn to Hurley's last argument, which concerns the trial court's denial of his request for a missing evidence instruction. At trial, Officer Thacker testified that he placed the drugs he seized from Hurley on the front, passenger-side floorboard of his vehicle before transporting Hurley to the PCDC. Hurley thereafter attempted to raise an imperfect chain of custody defense concerning the transport of the drugs. Based on the testimony of Lieutenant Hicks, it was Hurley's position that while he and Officer Thacker were in the sallyport of the PCDC, the drugs were taken from the floorboard, placed on the hood of the car, and photographed by a PCDC employee.

16

At trial, Hurley asked for a missing evidence instruction concerning the absence of security footage of the PCDC sallyport. The proposed instruction read:

> If you find from the evidence that a video recording of events on July 4, 2022 in the sally port [sic] at the Pike County Detention Center (PCDC) was in fact created by the PCDC recording system, and if you further find from the evidence that [sic] Commonwealth, by and through its agents at PCDC, intentionally and in bad faith lost or destroyed the video recording, you may, but are not required to, infer that the information recorded in the video recording would be, if available, adverse to Commonwealth and favorable to the defendant.

The Commonwealth countered this proposed instruction by explaining that the PCDC has a policy of only keeping the footage for twelve days, and that they engaged in no bad faith. The trial court thereafter denied Hurley's request for the missing evidence instruction.

Before this Court, Hurley alleges that the trial court erred when it denied his request for a missing evidence instruction. At the same time, however, Hurley also concedes that he "cannot argue to this Court that the Commonwealth acted in bad faith when it destroyed copies of the sallyport videos," and instead asks that we reconsider the heightened burden placed on criminal defendants when they seek a missing evidence instruction.

We review the trial court's decision to provide a jury instruction under an abuse of discretion standard:

> Under the familiar standard prescribed in *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999), a trial court abuses its discretion when its decision is arbitrary, unreasonable, unfair, or unsupported by sound legal principles. A decision to give or to decline to give a particular jury instruction inherently requires complete familiarity with the factual and evidentiary subtleties of the case that are best understood by the judge overseeing the trial from the bench in the

17

courtroom. Because such decisions are necessarily based upon the evidence presented at the trial, the trial judge's superior view of that evidence warrants a measure of deference from appellate courts that is reflected in the abuse of discretion standard.

*Downs v. Commonwealth*, 620 S.W.3d 604, 613 (Ky. 2020) (quoting *Sargent v. Shaffer*, 467 S.W.3d 198, 203 (Ky. 2015)) (internal quotations and citations omitted).

In *Estep v. Commonwealth*, this Court gave a detailed outline of the history and genesis of Kentucky's missing evidence instruction standard. 64 S.W.3d 805, 809-10 (Ky. 2002). There, we reiterated that "[t]he purpose of a 'missing evidence' instruction is to cure any Due Process violation attributable to the loss or destruction of exculpatory evidence by a less onerous remedy than dismissal or the suppression of relevant evidence." *Id.* at 810. Furthermore, we also upheld our previous holdings stating that the Due Process Clause is only implicated when the Commonwealth destroys or loses exculpatory evidence, the potentially exculpatory nature of that evidence was apparent when it was lost or destroyed, and the Commonwealth acted in bad faith. *Id.* at 809. (citing *Collins v. Commonwealth*, 951 S.W.2d 569, 572 (Ky. 1997)).

This standard clearly has deep roots in Kentucky precedent, and we see no reason to depart from our current missing evidence instruction standard in criminal cases. As a result, we decline Hurley's request that we reconsider our well-settled caselaw on the subject. Applying the missing evidence instruction standard as it exists today, we note that Hurley has not come forth with anything more than speculation to suggest that the Commonwealth acted in

bad faith in "destroying" the footage from the sallyport. Instead, there was clear evidence presented by the Commonwealth that it is the PCDC's routine policy to get rid of sallyport security footage after twelve days. Accordingly, the record indicates that there was nothing to support the giving of a missing evidence instruction, and we therefore cannot say that the trial court abused its discretion in denying Hurley's request for a missing evidence instruction.

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Steven Jared Buck
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Russell M. Coleman
Kentucky Attorney General

James Daryl Havey
Assistant Attorney General