Victor Dewayne TAYLOR, Appellant,

v.

COMMONWEALTH OF KENTUCKY,
Appellant.

No. 1998–SC–0355–MR.

Supreme Court of Kentucky.

Oct. 25, 2001.

As Modified on Denial of Rehearing
Nov.14, 2001.

Thomas M. Ransdell, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Margaret F. Case, Department of Public Advocacy, Stanford, Counsel for Appellant.

A.B. Chandler III, Attorney General of Kentucky, Janet M. Graham, Michael G. Wilson, Assistant Attorneys General, Criminal Appellate Division, Office of the Attorney General, Frankfort, Counsel for Appellee.

JOHNSTONE, Justice.

Appellant, Victor Dewayne Taylor, was convicted of two counts of first-degree murder, two counts of first-degree kidnapping, two counts of first-degree sodomy, and one count of first-degree robbery in connection with the murder of two teenage boys. He was sentenced to death on each of the murder and kidnapping charges and twenty years' imprisonment on each of the other charges, with the sentences to be run consecutively. His conviction was affirmed on direct appeal. *Taylor v. Commonwealth*, Ky., 821 S.W.2d 72 (1990), *cert. denied*, 502 U.S. 1100, 112 S.Ct. 1185,

117 L.Ed.2d 428 and *cert. denied*, 502 U.S. 1121, 112 S.Ct. 1243, 117 L.Ed.2d 475 (1992). However, we vacated the two death sentences on the kidnapping charges on grounds that those sentences violated the U.S. and Kentucky constitutional provisions against double jeopardy. *Id.* at 77. Subsequently, Taylor filed a RCr 11.42 motion to set aside the remaining judgments against him. After an evidentiary hearing, the trial court entered an order denying the motion. Taylor appeals that ruling to this Court as a matter of right. For the reasons set forth below, we affirm the trial court.

## EXCLUSION OF AFRICAN–AMERICAN JURORS

■ At the evidentiary hearing, Taylor placed into evidence testimony and material concerning his claim that the office of the Jefferson County Commonwealth's Attorney had a pattern and practice of systematically striking African–Americans from the jury venire. Taylor argued that this conduct violated his right to equal protection under the Fourteenth Amendment as held in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). However, *Swain* was overruled by *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Further, *Batson* applied retroactively to Taylor's case because his case was still pending review in this Court when *Batson* was decided and, consequently, was "not yet final" within the meaning of *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649, 661 (1987). Therefore, *Batson*, not *Swain*, applies to Taylor's case.

*Swain* holds that a "State's purposeful or deliberate denial" to African–Americans of the opportunity to serve as jurors solely because of race violates the right to equal protection under the Fourteenth Amendment. *Swain*, 380 U.S. at 203–04, 85 S.Ct. at 826–27, 13 L.Ed.2d at 763. To show a prima facie case under *Swain*, a criminal appellant has to show "through direct or indirect evidence, such as testimony or statistical proof, that the prosecutor had a systematic and intentional practice of excluding blacks from petit juries in criminal trials through the exercise of peremptory challenges, and that this practice continued unabated in [the appellant's] trial." *Love v. Jones*, 923 F.2d 816, 818 (1991). *Batson* overruled that portion of *Swain* that sets forth the necessary evidentiary showing needed to establish a prima facie case of racial discrimination.

The *Batson* Court held that a defendant "may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87. To establish a prima facie case under *Batson*, a defendant has to show that he is a "member of a cognizable racial group," that the prosecutor exercised "peremptory challenges to remove from the venire members of the defendant's race,"[1] and that those "facts *and any other relevant circumstances* raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Id.*, 106 S.Ct. at 1723, 90 L.Ed.2d at 87–88 (emphasis added). Upon making out a prima facie case, the burden shifts to the prosecutor to come forward with a race-neutral explanation for the challenged peremptory strikes. *Id.* at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88.

1. We note that we are aware that subsequent cases interpreting *Batson* have altered these two requirements. We are not holding otherwise in this opinion.

The *Batson* Court noted that lower courts had interpreted *Swain* as placing a "crippling burden of proof" which had effectively rendered a prosecutor's peremptory challenges immune from constitutional scrutiny. *Id.* at 92–93, 106 S.Ct. at 1720–21, 90 L.Ed.2d at 84–85. Thus, *Batson* overruled *Swain* in order to remove this disability on a defendant's constitutional challenge to a prosecutor's peremptory challenges. Nonetheless, Taylor claims error under *Swain* and its "crippling burden of proof" rather than *Batson* because he alleged a *Batson* violation on direct appeal. The issue was decided against Taylor on direct appeal and, therefore, cannot be raised in his RCr 11.42 motion. *See Thacker v. Commonwealth*, Ky., 476 S.W.2d 838, 839 (1972), which holds, "It is not the purpose of RCr 11.42 to permit a convicted defendant to retry issues which could and should have been raised in the original proceeding, nor those that were raised in the trial court and upon an appeal considered by this court." The *Swain* claim is an attempt to get around this long-established rule. Even if we were to hold that *Swain* and not *Batson* was controlling, Taylor's claim would still fail for the same reason his *Batson* claim failed on direct appeal.

The evidence presented by Taylor at the evidentiary hearing focused on the first part of his burden under *Swain*, *i.e.*, whether the prosecutor's office had a systematic and intentional practice of excluding blacks from juries in criminal trials. But he presented no evidence that this practice "continued unabated" at his trial. In addition to a prosecutor's exclusion of minority members from the venire via peremptory strikes, *Batson* also requires—to establish a prima facie case—a showing of "other relevant circumstances" that create an inference that the prosecutor struck the jurors on the basis of their race. *Com-*

*monwealth v. Hardy*, Ky., 775 S.W.2d 919, 920 (1989). In the case at bar, there was no showing of other relevant circumstances at the time defense counsel objected to the seating of the jury and no such argument on this point was made on direct appeal. Moreover, the trial court specifically noted that there was no evidence that African–Americans were systematically excluded from the venire. *Notice of Death Sentence Review* at 9, *Commonwealth v. Taylor*, 84–CR–1549 (Jefferson Circuit Court entered June 3, 1986). Therefore, since a prima facie case was not made under *Batson*, it certainly was not made under the much more restrictive holding of *Swain*.

## ALLEGED BRADY VIOLATIONS

Taylor alleges that the prosecution failed to disclose exculpatory information to the defense in violation of its duty to do so under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We address separately each alleged violation below because of the discrete and independent nature of each claim. We are aware that the materiality of evidence withheld by the prosecution is to be considered cumulatively and not item-by-item, *Kyles v. Whitley*, 514 U.S. 419, 436, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490, 507 (1995), and apply that standard below.

### 1. *FAILURE TO DISCLOSE REWARD OFFER*

Taylor argues that the Commonwealth failed to disclose that two of the witnesses against him, Cecil Pepper and Dino Pace, had been offered a reward of $12,100 if a conviction was obtained against Taylor. The Commonwealth argues that the defense was aware of this reward offer and, thus, there was no failure to disclose the information. We agree with the Commonwealth.

A general reward of $12,000 for "information leading to the arrest and conviction of the boys' killer" was offered by Harvey Sloane, who was the Mayor of Louisville at the time. The "boys" referred to were the two teenage boys Taylor was ultimately convicted of kidnapping and murdering. Information regarding the reward was publicized in the media and was public knowledge. In fact, defense counsel noted the reward in an attachment to Taylor's motion for a change of venue. Thus, this information was not withheld from the defense and was available to the defense for impeachment purposes at trial.

There was no *Brady* violation with respect to the offer of a $12,000 reward.

## 2. *FAILURE TO DISCLOSE THAT A WITNESS HAD BEEN RED-LINED*

■ Next, Taylor argues that the Commonwealth failed to reveal that Cecil Pepper, who identified Taylor at trial, had been red-lined, a local procedure formerly employed by Jefferson District Court Judges to restrict the number of warrants one person may swear out against another. Its purpose was to curb abuse of the warrant procedure. While only a district judge could red-line an individual, Taylor points out that the Jefferson County Attorney's Office had access to records concerning red-lining. Taylor argues that this was valuable impeachment evidence that could have seriously undermined the credibility of Pepper's testimony. Among other arguments, the Commonwealth states that there was no proof that the prosecution knew that Pepper had been red-lined. Again, we agree with the Commonwealth.

■ There is nothing in the record to indicate that the Commonwealth was aware that Pepper had been red-lined. Nor can that knowledge be imputed upon the Commonwealth. The *Brady* rule "encompasses evidence known only to police investigators and not to the prosecutor. In order to comply with *Brady*, therefore, the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Strickler v. Greene*, 527 U.S. 263, 280–81, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286, 301 (1999) (internal citations and quotation marks omitted). The district courts are part of the judicial branch of the Commonwealth's government, whereas the Commonwealth Attorney and the County Attorney belong to the executive branch. Therefore, information known to the district court cannot be imputed to the Commonwealth Attorney who prosecuted this case.

There was no *Brady* violation with respect to the red-lining of Cecil Pepper.

## 3. *FAILURE TO DISCLOSE MENTAL INQUEST WARRANT HAD BEEN ISSUED FOR A WITNESS*

Next, Taylor argues that the Commonwealth failed to disclose that Cecil Pepper had been arrested on a mental inquest warrant five months after Taylor had been arrested. Taylor argues that this evidence of mental illness could have affected Pepper's credibility and, therefore, should have been disclosed under the *Brady* rule. The Commonwealth argues that the evidence was not admissible and, thus, no violation occurred.

■ Under the *Brady* rule, the prosecution has a duty to disclose evidence concerning the credibility of a witness when the reliability of that witness "may well be determinative of guilt or innocence...." *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 109 (1972). The question then becomes whether the mental inquest evidence meets this criteria.

■ Pepper's arrest on a mental inquest warrant would not in and of itself be admissible at trial. Apparently, the warrant was sworn out by a police officer. The officer's lay opinion as to Pepper's mental state clearly would not have been admissible. Citing to *Bartholomew v. Wood*, 34 F.3d 870 (9th Cir.1994) (per curiam), Taylor argues that the "question is not whether exculpatory evidence is independently admissible, but whether it would lead to the discovery of admissible evidence." He then argues that knowledge of Pepper's arrest on a mental inquest warrant would have led to admissible evidence concerning Pepper's mental state. We disagree.

The U.S. Supreme Court overruled the very case cited by Taylor on the very same point in *Wood v. Bartholomew*, 516 U.S. 1, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995). At issue in *Wood* was whether the prosecution violated the *Brady* rule by failing to disclose the results of polygraph examinations given to two of the witnesses against the appellant at trial. *Id.* at 4–5, 116 S.Ct. at 9–10, 133 L.Ed.2d at 6. The *Wood* Court reasoned that there had been no violation:

> The information at issue here, then—the results of a polygraph examination of one of the witnesses—is not "evidence" at all. Disclosure of the polygraph results, then, could have had no direct effect on the outcome of trial, because respondent could have made no mention of them either during argument or while questioning witnesses. To get around this problem, the Ninth Circuit reasoned that the information, had it been disclosed to the defense, might have led respondent's counsel to conduct additional discovery that might have led to some additional evidence that could have been utilized. Other than expressing a belief that in a deposition [the witness] might have confessed to his involvement in the initial stages of the crime—a confession that itself would have been in no

way inconsistent with respondent's guilt—the Court of Appeals did not specify what particular evidence it had in mind. Its judgment is based on mere speculation, in violation of the standards we have established.

*Id.* at 6, 116 S.Ct. at 10, 133 L.Ed.2d at 7.

■ While *Wood* does not hold that disclosure of inadmissible evidence is never required under the *Brady* rule, the opinion makes clear that there can only be a violation when there is a "reasonable probability" that disclosure of the inadmissible evidence would have resulted in a different outcome at trial. *Id.* at 8, 116 S.Ct. at 11, 133 L.Ed.2d at 8. In the case at bar, the nondisclosure of the mental inquest warrant does not meet this standard.

Even if disclosure of the mental inquest warrant may have put the defense on notice to closely examine the issue of Pepper's mental state, there is nothing in the record to indicate that there exists or existed any *admissible* evidence on this issue. For evidence of Pepper's mental state to be relevant to his credibility, Taylor must "demonstrate[ ] that there was a mental deficiency on the part of the witness, either at the time of the testimony or at the time of the matter being testified about." *Commonwealth v. Huber*, Ky ., 711 S.W.2d 490, 491 (1986). No such demonstration had been made in this case.

There was no *Brady* violation with respect to the mental inquest warrant for Cecil Pepper.

### 4. FAILURE TO DISCLOSE A WITNESS'S HISTORY OF MENTAL ILLNESS

■ Taylor argues that the prosecution failed to disclose the mental history of Jeffery Brown, who testified against Taylor at trial. This argument fails for the

same reason the argument that failure to disclose the mental inquest warrant for Pepper fails. Additionally, the argument is vague and conclusory.

### 5. USE OF UNRELIABLE TESTIMONY

■ Taylor argues that Beverly Shackelford's testimony was totally unreliable because she had a history of mental illness and her testimony was contradictory to the "known facts" of the case. Taylor equates this to the knowing use of perjured testimony. We disagree.

First of all, "questions of credibility and weight of the evidence are jury matters." *Estep v. Commonwealth*, Ky., 957 S.W.2d 191, 193 (1997). Moreover, Shackelford's mental and emotional problems manifested themselves after Taylor's trial.

The Commonwealth breached no duty with respect to Shackelford's testimony.

### 6. THREAT OF PROSECUTION AGAINST A WITNESS

■ Finally, Taylor argues that the Commonwealth failed to reveal that it had threatened to prosecute a witness, Eugene Taylor, for Eugene's alleged connection with the murders at issue in this case, if Eugene did not testify against Taylor. The basis of this charge is a statement made by Eugene some eight years after Taylor's trial. Taylor presents no other evidence that such a threat was ever made; consequently, there is simply not a sufficient factual basis to reach the merits on this issue.

### INEFFECTIVE ASSISTANCE OF COUNSEL

■ Taylor raises some twenty-four (24) different ineffective assistance of counsel claims. Some of these claims are simply a reformulation of claims that either were or could have been raised on

direct appeal and, therefore, are not appropriately raised in a RCr 11.42 motion. Other issues concern the failure to request instructions contrary to or unsupported by Kentucky or federal law.

■ *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), sets forth the standard of review for an ineffective assistance of counsel claim:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. To show prejudice, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the outcome." *Id.* at 695, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. Finally, there exists a strong presumption that counsel's performance was effective. *Id.* at 690, 104 S.Ct. at 2052, 80 L.Ed.2d at 694. We apply the *Strickland* standard to the ineffective assistance of counsel claims addressed below.

### 1. ISSUES RAISED AND RESOLVED ON DIRECT APPEAL

■ Taylor raised forty-four (44) issues on direct appeal. We directly addressed only a select few of these issues in that opinion. The rest we cursorily dismissed by stating: "Allegations of error which we consider to be without merit will

not be addressed here." *Taylor*, 821 S.W.2d at 74. Even though some issues were not specifically addressed on direct appeal, they were all considered and resolved against Taylor. *See Commonwealth Transportation Cabinet Department of Highways v. Taub*, Ky., 766 S.W.2d 49, 51–52 (1988). Taylor tries to circumvent this well-settled rule by glossing errors already raised as claims of ineffective assistance of counsel. These issues include:

a. *Failure to Make a Timely Request for a Change of Venue*

Taylor argues that his attorneys were ineffective for failing to make a timely request for a second change of venue. On direct appeal, we noted that the trial court did not abuse its discretion in denying the motion because the defense did not give reasonable notice. *Taylor*, 821 S.W.2d at 76. But we also noted that the trial court kept the issue open should need arise to revisit the issue and, further, that the trial court had little trouble seating an unbiased jury. *Id.* at 76–77.

b. *Failure to Request Additional Psychological Testing*

As required by statute and due process, a competency hearing was held to determine if Taylor was competent to stand trial. Three experts testified on the issue at the hearing, and Taylor was found competent to stand trial. The issue of Taylor's competency was raised and rejected on direct appeal. *Appellant's Brief* at 92–97, *Taylor, supra.*

c. *Failure to Object to Prosecutor's Closing Remarks*

The issue of the appropriateness of the prosecutor's closing remarks was raised and rejected on direct appeal. *Appellant's Brief* at 83–84, *Taylor, supra.*

## 2. *CLAIMS NOT SUPPORTED BY LAW*

■ Taylor raises a number of ineffective assistance of counsel claims that involve the failure to request instructions. Because these claims are contrary to or unsupported by Kentucky or federal law, we therefore reject them. These claims include: (i) failure to request an instruction limiting the jury's consideration of aggravating circumstances to only those enumerated in the instructions; (ii) failure to request an instruction that the jury's findings on mitigation evidence do not have to be unanimous; (iii) failure to request an instruction that the jury must find that the aggravating circumstances outweigh the mitigating circumstances before the death penalty could be imposed; (iv) failure to request an instruction defining reasonable doubt; (v) failure to request an instruction that the jury must begin its deliberations with the presumptions that life imprisonment is the appropriate penalty; (vi) failure to request an instruction that a decision to impose the death penalty should be a moral judgment in light of all available evidence; (vii) failure to request an instruction that would require the jury to presume that a life sentence would be served in its entirety; (viii) failure to request an instruction that would require the jury to presume that if he were sentenced to die, Taylor would be electrocuted; (ix) failure to request an instruction that would require the jury to return a sentence of less than death if any juror disagreed as to the appropriateness of the death penalty; and (x) failure to request an instruction to disregard the possibility of parole.

These claims are unsupported by state or federal law and will be considered no further.

## 3. *FAILURE TO INTRODUCE MITIGATING EVIDENCE*

■ Taylor presents a list of mitigating evidence that he argues should have been presented during the penalty phase of his trial. He claims that his counsel was ineffective for either not presenting the evidence or failing to discover it in the first place. In support of this argument, he cites to a long list of cases that hold that failure to investigate and present mitigating evidence is reversible error. But these cases concern the complete failure to either investigate mitigating evidence or to present available mitigating evidence, or both. Such is not the case here where defense counsel did introduce the favorable testimony of numerous witnesses in support of mitigation. Thus, Taylor's argument is basically that defense counsel did not put on enough or all of the available mitigation evidence.

■ Defense counsel is not required to place all available mitigating circumstances into evidence. *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir.), *cert. denied*, 516 U.S. 856, 116 S.Ct. 160, 133 L.Ed.2d 103 (1995). The mitigation evidence presented on Taylor's behalf included testimony concerning his mental state, his background, his family history, his time spent in foster homes, the physical and mental abuse inflicted upon him by his parents, and his distrust of people and institutions.

There was no ineffective assistance of counsel concerning the quantity and quality of mitigating evidence presented during the penalty phase of Taylor's trial.

### 4. FAILURE TO TIMELY DISCLOSE SOCIAL SERVICE REPORTS TO THE COMMONWEALTH

■ The defense called Father William Medley to present mitigating evidence during the penalty phase of Taylor's trial. Defense counsel sought to elicit testimony from Father Medley concerning Taylor's social history. The Commonwealth objected on grounds that Father Medley's testimony was based on social reports that were not disclosed to the Commonwealth during reciprocal discovery. The trial court sustained the objection. Taylor argues that his defense counsel was ineffective for not making the required disclosure. As a result, Taylor claims that the jury was deprived of hearing powerful mitigating evidence concerning his family background, which was placed into the record by avowal.

■ The avowal testimony based on the social service reports—which were not prepared by Father Medley—was classic hearsay. Taylor has made no argument that the testimony was admissible pursuant to an exception to the hearsay rule. Thus, the avowal testimony was not admissible and, therefore, the failure to produce the reports could not have resulted in ineffective assistance. *See Stanford v. Commonwealth*, Ky., 854 S.W.2d 742, 748 (1993), *cert. denied*, 510 U.S. 1049, 114 S.Ct. 703, 126 L.Ed.2d 669 (1994). Further, the evidence was mostly cumulative to the testimony of Taylor's sister, which was admitted during the penalty phase of Taylor's trial. Finally, as explained above, defense counsel was not ineffective in the presentation of mitigating evidence at the penalty phase of Taylor's trial.

There was no ineffective assistance of counsel concerning the failure to produce the social service reports during discovery.

### 5. MISQUOTING THE BIBLE

■ The following exchange occurred between defense counsel and a prosecution witness who had been incarcerated with Taylor:

Q. You gained his confidence.... You held yourself out to help him. And then you dumped him in to save yourself fifteen years, right?

A. Yes.

Q. You got a pretty good deal on that robbery, didn't you?

A. Yes, sir.

Q. A real good deal, right? I mean Judas only got twenty pieces of silver for betraying Christ, didn't he?

Taylor argues that he was prejudiced by this last remark when the prosecutor pointed out to the jury that Judas betrayed Christ for *thirty* pieces of silver and not twenty. Taylor claims that this biblical misquote made the defense look like "a bunch of heathens." The argument is without merit and borders on being sanctionable for its frivolity.

### 6. *FAILURE TO OBJECT TO IN-TRODUCTION OF EVIDENCE*

■ The prosecution introduced four hollow-point, .357 magnum shells that were found in a dresser in the house of Taylor's sister, which was where Taylor was living at the time of the murders. While this was the same type of ammunition used to kill the two boys, Taylor argues that the bullets were not relevant because there was no evidence introduced that linked these bullets to either the crime itself or to Taylor. He then argues that his defense counsel was ineffective for failing to object to the introduction of this evidence. The Commonwealth argues that the evidence was admissible and that it was defense counsels' trial strategy to not object to the evidence.

It appears from a thorough review of the record that it was trial strategy not to object to the introduction of the bullet evidence. Defense counsel made a strong argument during closing that the evidence was not relevant and used that fact to discredit the Commonwealth's case. Clearly, defense counsel knew that the relevance of the bullet evidence was weak and used this fact in Taylor's favor.

■ Next, Taylor argues that defense counsel was ineffective for failing to move to exclude evidence of insect and rat mutilation during Dr. George Nichols' testimony. Again, we disagree.

Dr. Nichols performed the autopsies on the two murdered boys. While testifying concerning the autopsy of one of the boys, the following exchange occurred between the Commonwealth's Attorney and Dr. Nichols:

Q. Were there any other deformities noted on the body, sir?

A. Well, an insect deformity was, indeed, present on the skin of the upper abdomen, which was felt to be post mortem and felt to be of the garden variety, either an ant or cockroach.

Shortly after the above exchange, the Commonwealth's Attorney moved to admit certain post-mortem photographs of the boys. Defense counsel objected. At the bench conference concerning the objection, defense counsel also moved to exclude any evidence of "post-mortem insect trauma and post-mortem rodent trauma" during Dr. Nichols' testimony concerning his autopsy of the other murdered boy. This motion was granted. Thus, Taylor's ineffective assistance argument is that trial counsel should have objected to the above-outlined testimony by Dr. Nichols.

First of all, Dr. Nichols' reference to insect trauma was brief and cursory. More importantly, the testimony came in response not to a direct question about insect trauma, but rather, it came in response to a general question about "other deformities." There is no indication that defense counsel should have anticipated Dr. Nichols' exact response to this question. Further, after the response was made, the most likely relief at that point would have been an admonishment from the trial court. Trial counsel may have

well felt that an admonishment would have only served to focus the jury's attention on the issue.

There was no ineffective assistance of counsel concerning the failure to object to either the introduction of the bullet evidence or to Dr. Nichols' testimony concerning insect trauma.

### 7. FAILURE TO EFFECTIVELY CROSS–EXAMINE WITNESS

Some background information is necessary to understand this argument. Taylor and George Wade were both indicted for the murders for which Taylor stands convicted. The trials were severed. Wade was tried first, found guilty, and sentenced to life imprisonment. Before he was arrested, Wade was questioned by the police. In the course of being questioned, he confessed to the crimes. His confession was introduced at Taylor's trial under an exception to the hearsay rule. *Taylor*, 821 S.W.2d at 74. In the confession, Wade identified Taylor as the triggerman.

■ Detective Leslie Wilson testified for the Commonwealth at both Taylor's trial and Wade's trial. Taylor argues that, if properly questioned, Detective Wilson would have testified that—during the police questioning of Wade—he told Wade that police had heard on the street that Wade was present at the shootings, but that Taylor had pulled the trigger. This, Taylor argues, would have impeached or discredited Wade's confession by explaining how Wade came to implicate Taylor as the triggerman. The Commonwealth argues that this was trial strategy and that similar evidence was admitted through the cross-examination of another witness. We agree.

The defense made a motion in limine to exclude any reference to evidence gathered "on the street." The trial court granted the motion. Wilson's testimony at Wade's trial was that the police were hearing "on the street" that Wade and Taylor committed the murders and that Taylor was the triggerman. Thus, presumably Wilson's testimony on this point at Taylor's trial would have been similar and could have opened the door to evidence gathered "on the street." This would have undermined existing trial strategy. Further, defense counsel did cross-examine a Detective Duff about whether Detective Wilson "fed" Taylor's name to Wade during police questioning of Wade.

There was no ineffective assistance of counsel concerning the cross-examination of Detective Wilson.

### 8. FAILURE TO POINT OUT TO THE JURY THAT TAYLOR WAS NOT IDENTIFIED IN A LINEUP

■ Dino Pace, an identification witness, failed to identify Taylor in a photo pack lineup. Further, the police never placed Taylor in an in-person lineup for identification by either Pace or Cecil Pepper, who was another identification witness. We have reviewed defense counsel's cross-examination of these witnesses and defense counsel's closing argument. Defense counsel vigorously attacked the reliability of Pace's and Pepper's identification of Taylor. Apparently, Taylor's argument is that defense counsel was ineffective for specifically failing to ask Pace whether he had been able to identify Taylor in the photo pack. In light of what the defense did do to attack the reliability of Pepper's identification, what little it failed to do does not come even close to rising to the level of ineffective assistance of counsel.

### 9. FAILURE TO REQUEST A MISSING EVIDENCE INSTRUCTION

Inexplicably, the two murdered boys' underwear disappeared and was never located. Defense counsel moved to dismiss the sodomy charges against Taylor be-

cause "the loss of the undershorts of the victims not only results in the loss of material evidence to which the defendant had a right to have tested, but also means the loss of potentially exculpatory evidence." The trial court denied the motion. Subsequently, defense counsel did not request a missing-evidence instruction based on the missing underwear. Taylor argues that this failure resulted in ineffective assistance of counsel.

■■■■■ At first blush, it appears that Taylor would have been entitled to a missing evidence instruction if defense counsel had moved for one. *See Collins v. Commonwealth,* Ky., 951 S.W.2d 569, 573 (1997). Such an instruction would have informed the jury that it could, but was not required to, infer that the underwear evidence if available would have been favorable to Taylor. But Taylor was tried in 1986. *Collins* was rendered in 1997. The use of a missing-evidence instruction was first approved of in 1988 in *Sanborn v. Commonwealth,* Ky., 754 S.W.2d 534, 539 (1988). Thus, there was no Kentucky authority for allowing the use of a missing-evidence instruction at the time of Taylor's trial. Failure to anticipate changes in the law cannot constitute ineffective assistance of counsel. *Sanborn v. Commonwealth,* Ky., 975 S.W.2d 905, 913 (1998), *cert. denied,* 526 U.S. 1025, 119 S.Ct. 1266, 143 L.Ed.2d 361 (1999). Further, even if failure to request the instruction was error, the effect of such an instruction on the jury in this case is pure speculation.

The jury may or may not have made the inference allowed by the instruction. Even if it had, it still could have found Taylor guilty of sodomy. In light of the totality of evidence presented against Taylor, we cannot say that there exists a reasonable probability that the jury's verdict would have been different.

### 10. *OTHER CLAIMS OF INEFFEC-TIVE ASSISTANCE*

Finally, Taylor makes a number of claims of various failure on the part of defense counsel that are so trivial, so contrary to the record, or so without foundation that they do not merit separate analysis. These errors include: (i) failure to point out that the police did not investigate Wade's girlfriend's residence; (ii) failure to cross-examine Cecil Pepper regarding contradictory statements he allegedly made to the police; (iii) failure to raise the staleness of the information in affidavits used to provide probable cause for search warrants; (iv) failure to point out that hair and acid phosphates evidence came from two different shirts; (v) failure to effectively cross-examine Beverly Shackelford; (vi) failure to uncover that Ira Brown—a witness against Taylor—was collecting newspaper articles about the murders before Taylor was arrested; (vii) failure to preserve the issue that electrocution violates the Eighth Amendment to the U.S. Constitution; and (viii) failure to object to placing Taylor in shackles after his emotional outburst during the penalty phase of his trial.

### INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

■■■■ Taylor raises a number of claims of ineffective assistance of appellate counsel claims. Such claims cannot be raised in a RCr 11.42 motion. *Harper v. Commonwealth,* Ky., 978 S.W.2d 311, 318 (1998), *cert. denied,* 526 U.S. 1056, 119 S.Ct. 1367, 143 L.Ed.2d 527 (1999). Therefore, these claims will not be considered.

### BIASED TRIAL JUDGE

■■■■ Taylor argues that the trial judge prematurely decided that the death penalty was the appropriate punishment in this

case. Taylor bases this argument on the testimony—at the evidentiary hearing on his RCr 11.42 motion—of a single juror who sat on his case. She testified that, after the verdicts had been rendered, the trial judge stated to the jury that it had done "the right thing" by returning a recommendation for death. This was not corroborated by any other evidence. The trial judge did not testify at the RCr 11.42 hearing. The evidence of bias is woefully insufficient to set aside Taylor's sentence, especially in view of the evenhandedness demonstrated by the trial judge throughout the trial.

## IMPROPER CONSIDERATION OF EXTRANEOUS FACTORS BY THE JURY

 Taylor argues that the jury improperly considered the possibility of parole during sentencing deliberations. Further, he argues that certain jurors prayed before casting their votes on sentencing. These arguments are based on the testimony—at the evidentiary hearing on his RCr 11.42 motion—of some of the jurors who sat on his case. This testimony was improper and should not have been allowed. *Gall v. Commonwealth*, Ky., 702 S.W.2d 37, 44 (1985), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986); RCr 10.04.

## RECONSIDERATION OF THE ADMISSIBILITY OF WADE'S CONFESSION

Finally, Taylor argues that we should reconsider the admissibility of Wade's confession in light of the U.S. Supreme Court's decision in *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). For the reasons set forth below, we decline the invitation.

 When a hearsay declarant is unavailable for cross-examination at a criminal trial, the hearsay statement is only admissible against the defendant under the Confrontation Clause if it "bears adequate indicia of reliability." *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608 (1980). When a hearsay statement falls within a "firmly rooted" hearsay exception, reliability is assumed. *Id.* If the statement does not fall within a firmly rooted hearsay exception, reliability is not assumed and must be affirmatively shown by demonstrating that the statement has "particularized guarantees of trustworthiness." *Id.* Further, to "be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990).

*Lilly, supra,* is a plurality opinion in which four Justices held in the lead opinion that the statements against penal interest exception to the hearsay rule is not firmly rooted for Confrontation Clause purposes. *Lilly,* 527 U.S. at 134, 119 S.Ct. at 1900, 144 L.Ed.2d at 133. But, while casting doubt on the proposition, the plurality opinion did not foreclose the possibility that a particular statement against penal interest could be admitted pursuant to the second prong of *Roberts, supra, i.e.,* that the statement still could be shown to "possess adequate indicia of reliability by virtue of its inherent trustworthiness." *Id.* at 137–38, 119 S.Ct. at 1900–01, 144 L.Ed.2d at 134–35. In concurrence, three of the Justices—Chief Justice Rehnquist, Justice O'Connor and Justice Kennedy—would have reversed and remanded the case to the Supreme Court of Virginia for a determination of whether the confession at issue bore "particularized guarantees of trustworthiness" under *Roberts. Id.* at 148, 119 S.Ct. at 1905, 144 L.Ed.2d at 141 (Rehn-

quist, C.J., concurring). The plurality opinion rejected this option because: (1) the Court granted certiorari on the issue of whether hearsay statements against penal interest are "firmly rooted" for Confrontation Clause purposes, and the issue was fully briefed by both parties; (2) the test of admissibility employed by the Virginia Supreme Court was "virtually identical to the *Roberts* 'particularized guarantees' test, which turns as well on the 'surrounding circumstances' of the statements"; and (3) no argument was made that there were other relevant circumstances left for the Virginia Supreme Court to consider. *Id.* at 135 n. 6, 119 S.Ct. at 1899 n. 66, 144 L.Ed.2d at 134 n. 6.

It is not clear to what extent, if any, *Lilly* changes the law. As a plurality opinion, it is not binding precedent on the issue of whether statements against penal interests are "firmly rooted" for Confrontation Clause purposes. *See Texas v. Brown*, 460 U.S. 730, 737, 103 S.Ct. 1535, 1541, 75 L.Ed.2d 502, 510–11 (1983); *see also Gabow v. Commonwealth*, 34 S.W.3d 63, 78 (2000), *petition for cert. filed*, April 25, 2001. Moreover, in *Taylor* we did not hold that the statements against penal interest exception to the hearsay rule was "firmly rooted" for Confrontation Clause purposes. Rather, we held that Wade's confession was properly admitted as a statement against penal interest pursuant to FRE 804(b)(3), which we adopted as a rule of evidence in this Commonwealth in *Crawley v. Commonwealth*, Ky., 568 S.W.2d 927 (1978).

In determining that the confession was admissible against Taylor, we noted both: (1) the existence of corroborating evidence of Wade's confession, which is an evidentiary prerequisite to the admission of a statement against penal interest as an exception to the hearsay rule under FRE 804(b)(3) and *Crawley, and* (2) the circumstances surrounding the making of Wade's confession, which, under *Idaho v. Wright*, is a constitutional requirement to the admission of a hearsay statement that does not fall within a firmly rooted exception to the hearsay rule. *Taylor*, 821 S.W.2d at 74–75. In addition to holding that Wade's confession was properly admitted under the rules of evidence, we also held that its admission did not violate Taylor's constitutional rights.

■ On direct appeal, both the majority and dissenting opinions addressed and discussed Taylor's Confrontation Clause argument. *Taylor*, 821 S.W.2d at 75–76, 80–82. Thus, the issue of whether Wade's statement was admissible under the Kentucky and U.S. Constitutions was decided against Taylor on direct appeal. Therefore, given *Roberts* either/or two-prong approach to admissibility, *Taylor* should be read as holding that Wade's confession was admissible under the second prong of *Roberts*, rather than as a "firmly rooted" exception to the hearsay rule. Consequently, even if *Lilly* was binding precedent, *Lilly* would not *a fortiori* overrule *Taylor*.

■ Therefore, Taylor's argument is reduced to a plea that we reexamine an issue that was raised and decided against him on direct appeal. This is foreclosed by both the above-discussed rule set forth in *Thacker*, and the law of the case doctrine. Under the law of the case doctrine, "an opinion or decision of an appellate court in the same cause is the law of the case for a subsequent trial or appeal however erroneous the opinion or decision may have been." *Union Light, Heat & Power Co. v. Blackwell's Adm'r*, Ky., 291 S.W.2d 539, 542 (1956). A rarely-employed exception to the law of the case doctrine exists when it can be shown that the former decision was clearly and palpably erroneous, but no such showing is made in this case. *Lilly* does not overrule or render

*Taylor* erroneous. Nor is it clearly apparent that *Taylor* reaches the wrong result under the applicable case law.

In conclusion, we note that any allegation of error not specifically addressed above has been considered and rejected as having no merit.

For the reasons set forth above, we affirm the trial court's ruling.

LAMBERT, C.J.; COOPER, GRAVES, and WINTERSHEIMER, JJ., concur.

KELLER, J., dissents by separate opinion, with STUMBO, J., joining that dissenting opinion.

STUMBO, J., dissents by separate opinion.

KELLER, Justice, Dissenting.

Today's majority opinion represents the *second* time this Court has allowed Taylor's conviction and death-sentence to stand despite "a paradigmatic Confrontation Clause violation." [1] This Court clearly erred in *Taylor v. Commonwealth* [2] when it held that the trial court properly allowed the Commonwealth to introduce Taylor's co-defendant's statement as evidence against Taylor. The *Taylor I* Court's conclusion that Wade's statements were trustworthy and, therefore, admissible, rests upon its consideration of factors that the United States Supreme Court had rejected prior to Taylor's trial [3] and factors rejected before *Taylor I* became final [4] as well as an analysis of statements against penal interest that the Court has subsequently discredited. [5] I agree, however, with just

1. *Lilly v. Virginia,* 527 U.S. 116 at 143, 119 S.Ct. 1887 at 1903, 144 L.Ed.2d 117 (1999) (Scalia, J. dissenting) (hereafter *"Lilly "*).

2. Ky., 821 S.W.2d 72, 74–76 (1990) (hereafter *"Taylor I "*).

3. *See Taylor I, supra* note 2 at 74–75 (addressing voluntariness of co-defendant's statement: "He was Mirandized three times ... [h]is final waiver of rights was tape-recorded, reduced to writing and signed in the presence of two police officers ."). *But see Lee v. Illinois,* 476 U.S. 530, 544, 106 S.Ct. 2056, 90 L.Ed.2d 514, 528 (1986) ("Although ... the confession was found to be voluntary for Fifth Amendment purposes, *such a finding does not bear on the question of whether the confession was also free from any desire, motive, or impulse [declarant] might have had either to mitigate the appearance of his own culpability by spreading the blame or to overstate [defendant's] involvement ...."* (emphasis added)).

4. *See Taylor I, supra* note 2 at 74 ("[T]he admissions against Taylor in Wade's statement were essentially consistent with ... the testimony of three other prosecution witnesses ...."); *Id.* at 75 ("The statement Wade gave to the police was corroborated in part by five different witnesses. Every material detail of Wade's confession was corroborated by independent testimony and physical evi-

dence."); *Id.* ("Wade's confession was corroborated in every material detail by independent testimony and physical evidence."); *Id.* ("Wade was unavailable, his statement was against his own interest, and *from the physical evidence,* the testimony of witness [sic] and Wade's confession, *it was reliable and trustworthy."* (emphasis added)); *Id.* at 76 ("[W]hat may be unreliable in isolation may be probative when corroborated by other evidence."). *But see Idaho v. Wright,* 497 U.S. 805, 822, 110 S.Ct. 3139, 111 L.Ed.2d 638, 656–57 (1990) ("To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, *not by reference to other evidence at trial."* (emphasis added)). *See also Taylor I* at 81 (Leibson, J. dissenting) (noting that Taylor cited the Court to *Idaho v. Wright* on petition for rehearing).

5. *See Taylor I, supra* note 2 at 75 ("[Wade's] confession was not any less a statement against his own penal interest simply because it also implicated Taylor.... The determination of whether an out of court statement is against the declarant's penal interest does not require an assessment of the declarant's subjective motivation."). *But see Williamson v. United States,* 512 U.S. 594, 599, 114 S.Ct. 2431, 129 L.Ed.2d 476, 482–83 (1994):

one statement in the majority opinion's analysis of this issue—but not in the sense the majority intended—"*Lilly* does not ... *render Taylor* erroneous."[6] I agree with this statement because *Lilly* did not make *Taylor I* any "more wrong" than it was already; it merely confirmed what we already knew—*Taylor I* was wrong the day it was rendered, it is wrong today, and it will remain wrong tomorrow.

The majority opinion makes no serious attempt to justify the holding in *Taylor I*, and instead "declines the invitation" to correct the error after concluding that the law of the case doctrine prevents this Court from revisiting its prior determination. Nothing could be further from the truth—this Court has repeatedly recognized that "the law of the case rule has sufficient flexibility to permit the appellate court to admit and correct an error made in the previous decision where substantial injustice might otherwise result and the former decision is clearly and palpably erroneous."[7] Our role as Justices of this Court is not so mechanical that we must pretend the Emperor is fully clothed when he stands stark naked before us, and our predecessor Court recognized that the law of the case doctrine does not stand in the way of fundamental justice:

> The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature.
> ... Self-exculpatory statements are *exactly* the ones which people are most likely to make even when they are false; and mere proximity to other, self-inculpatory, statements does not increase the plausibility of the self-exculpatory statements.
> ... The fact that a statement is self-inculpatory does make it more reliable; but the fact that a statement is collateral to a self-

Notwithstanding the firmness of this rule in general, a number of courts have maintained and held that the rule is not inflexible but is subject to exception, although the exception must be rare and the former decision must appear to be clearly and palpably erroneous. *In such a case it is deemed to be the duty of the court to admit its error rather than to sanction an unjust result* and "deny to litigants and ourselves the right and duty of correcting an error merely because of what we may be later convinced was merely our ipse dixit in a prior ruling in the same case." ...

. . .

... [T]hese cases reflect an accelerating trend to make an exception to the general rule where it clearly appears that the result of the error to be cured outweighs any harm that may be done in the particular case ....

The Court should look to the effect of its own error rather than merely acknowledge that error was committed and let it go at that. *It should wipe out the effect of the mistake in the first opinion rather than perpetuate the error which would otherwise result in a great wrong to the litigant* and establish a bad precedent. *That is essential justice.*[8]

inculpatory statement says *nothing at all* about the collateral statement's reliability. *Id.* (emphasis added).

6. *Majority Opinion* at 63 S.W.3d 151, 167-168 (2001) (emphasis added).

7. *Gossett v. Commonwealth*, Ky., 441 S.W.2d 117, 118 (1969). *See also White v. Commonwealth*, Ky., 360 S.W.2d 198, 202 (1962) ("[W]e consider that the law of the case rule has sufficient flexibility to permit us to admit and correct our error, particularly where substantial injustice might otherwise result.")

8. *Union Light, Heat & Power Co. v. Blackwell's Adm'r*, Ky., 291 S.W.2d 539, 542–3 (1956) (emphasis added and citation omitted).

The law of the case doctrine, unlike res judicata, "is not an inexorable command, or a constitutional requirement, but is, rather, a *discretionary policy* which expresses the practice of the courts generally to refuse to reopen a matter already decided, without limiting their power to do so." [9] The United States Supreme Court has emphasized that courts have the discretion to follow a prior ruling as law of the case: "The prior ruling may have been followed as the law of the case, but there is a difference between such adherence and res judicata; one directs discussion, the other supersedes it and compels judgment ... in one it is a question of power, in the other of submission." [10]

While I recognize the desire "to prevent vexatiously long litigation and indefinite postponement of final judgment," [11] hopefully—surely—the majority does not value finality more importantly than ensuring a constitutionally fair trial when a human life is at stake.

In any event, "[t]he application of the rule must be viewed in the light of its purpose, and ... where extension of its effect will result in the very evil which its existence is intended to prevent ... [it] will not be applied." [12] The egregious and palpable nature of this constitutional violation virtually guarantees that a future re-viewing court will grant Taylor a new trial. In fact, all recent indications suggest that *this* Court, when confronted on direct appeal with a co-defendant's self-exculpatory statements which, like Wade's, lack any "particularized guarantees of trustworthiness," will hold that the Confrontation Clause prohibits their introduction.[13] By abdicating its responsibility to correct the error in *Taylor I*, today's majority needlessly prolongs this litigation and accomplishes only a hollow victory for finality. It is an unavoidable fact that, as time passes on, memories fade and witnesses become unavailable. *When* a future court grants Taylor a new trial, today's majority opinion's "legacy" will be only further evidentiary staleness, and justice may then succumb to a want of proof.

STUMBO, J., joins this dissenting opinion.

STUMBO, Justice, Dissenting.

Respectfully, I dissent from the majority opinion in this case on two of the issues decided therein. First, Taylor has made a prima facie case under both *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), and *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Next, I would reach the merits of Taylor's Confrontation

---

**9.** 5 Am.Jur.2d (Appellate Review) § 605 (emphasis added).

**10.** *Southern Railway Co. v. Clift*, 260 U.S. 316, 319, 43 S.Ct. 126, 67 L.Ed. 283, 284 (1922).

**11.** *Gossett v. Commonwealth, supra* note 7 at 118.

**12.** *Id.* at 118–119.

**13.** *See Murphy v. Commonwealth*, Ky., 50 S.W.3d 173, 183–4 (2001) ("[W]hile [the] confessions may fall under the hearsay exception for declarations against penal interest, KRE 804(b)(3), such exception has yet to be de-clared 'firmly rooted.' Finally, we cannot conclude that the confessions have sufficient 'particularized guarantees of trustworthiness' so as to render them admissible." (citation omitted)).. *See also Osborne v. Commonwealth*, Ky., 43 S.W.3d 234, 239–241 (2001) ("Pursuant to *Williamson*, each statement within the broader narrative must be examined individually to determine whether it is, in fact, self-inculpatory."). *Cf. Gabow v. Commonwealth*, Ky., 34 S.W.3d 63, 75–80 (2000) (finding a co-defendant's statement admissible because it was self-inculpatory and possessed numerous indications of trustworthiness not present in *Taylor I*).

Clause with respect to the admission of Wade's confession.

Taylor produced very impressive evidence in support of his claim that the Commonwealth Attorney violated his right to equal protection of law by using peremptory strikes to remove African–American jurors from the jury venire solely on account of the jurors' race. The evidence presented included:

(1) Passages from the *Kentucky Prosecutor's Handbook* that stated that the following were not "preferable" jurors for the prosecution: (1) a juror who came from a "[m]inority group[ ] who may have a grudge against law enforcement;" and (2) a "juror of racial or national background to that of the defendant."

(2) Observations by a then-sitting Jefferson Circuit Judge that she discharged a panel in a particular case because the Commonwealth Attorney used peremptory strikes to remove all black jurors on the venire and because of her "awareness that the Commonwealth had in other prior cases also elected to utilize strikes to remove all blacks."

(3) The testimony of a former Jefferson County public defender that he had observed a pattern and practice of the Commonwealth using peremptory strikes to remove blacks from jury venires.

(4) The testimony of a private attorney that he had observed the same pattern and practice on behalf of the Commonwealth in "dozens and dozens of murder cases, many of which had been tried capitally."

(5) The testimony of a former staff attorney who worked for the Jefferson County Commonwealth Attorney, who testified that it was understood in the office that prosecutors should strive to strike jurors with the same ethnic background. Further, she testified that it was common knowledge that the same Commonwealth Attorney who prosecuted Taylor's case— who is also African–American—believed that blacks on the jury panel were bad.

The above evidence is of the same quantity and quality presented in *Love v. Jones,* 923 F.2d 816 (1991), which held that the defendant had made a prima facie case under *Swain.* Further, the Commonwealth used peremptory strikes to remove all but one African–American juror from the jury venire. Thus, the "practice continued unabated" at Taylor's trial. *Id.* at 818. A *prima facie case* is established when a party produces "enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." *Black's Law Dictionary* (7th ed.1999). There is no doubt in my mind that Taylor produced enough evidence to allow the inference that the Commonwealth Attorney used peremptory strikes in this case to remove African–Americans from the jury venire solely on the basis of race. Next, I am frankly baffled by the majority's reliance on the fact that *Batson* overruled *Swain* to deny Taylor relief.

In overruling *Swain,* the *Batson* Court sought to remove a defendant's "crippling burden of proof" to establish an Equal Protection Clause violation under the evidentiary formulation set forth in cases interpreting *Swain. Batson,* 476 U.S. at 92, 106 S.Ct. at 1721–22, 90 L.Ed.2d at 85–86. To use *Batson* as a shield to prevent bringing Taylor's equal protection claim to light is a perversion of the spirit and intent of *Batson.* And, I would also note that precious little light indeed has been shed on this claim.

Taylor did raise a *Batson* claim on direct appeal. While that claim was necessarily rejected in the opinion affirming his conviction, there was absolutely no analysis of the claim. We are left in the dark as to why the claim was rejected. The majority opinion's assertion that Taylor's *Batson*

claim was rejected on direct appeal because he failed to establish a prima facie case is pure speculation.

In discussing what might constitute "other relevant circumstances" required to establish a prima facie case, *Batson* states clearly that a " 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *Id.* at 96–97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. There was—as was argued by defense counsel in the objection to seating of the jury—a clear pattern of using peremptory strikes to remove African–Americans from the venire in Taylor's case. While I would hold that the evidence presented by Taylor in support of his *Swain* claim was sufficient in itself to establish a prima facie case under *Batson*—and that this alone should be grounds to revisit an important constitutional issue decided but never addressed on direct appeal—whether a prima facie case was established is of no consequence to the merits of Taylor's claim on this issue.

The establishment of a prima facie case does not entitle a defendant to relief under *Swain*. Rather, it shifts the burden on the government to put forth a race-neutral reason for its use of peremptory strikes. *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88; *Jones*, 923 F.2d at 820. In this case, the Commonwealth Attorney did offer a reason for its use of peremptory strikes to remove African–American jurors from the venire, and that reason was anything but race-neutral.

In response to the defense's objection to the seating of the jury, the Commonwealth Attorney explained his reasons for his peremptory strikes: "In accordance with case law, the Commonwealth *has no other rational reason*—if I strike all [black jurors] it then becomes objectionable under the cases coming from … California." Fur-

ther, the trial court's remarks in overruling the objection make clear that it did not accept this explanation as race-neutral: "I believe the issue being addressed at this time as to whether it is permissible to exercise your peremptory strikes whichever way you wish to. I don't know, but the record is clear as to what has been done in this case." If anything, the remarks indicate that the trial court assumed that race-based strikes were permissible.

In my mind, once the prosecutor comes forth with an explanation for his or her use of peremptory strikes, the issue of whether the defendant has established a prima facie case becomes moot. The establishment of a prima facie case only serves to shift the burden of proof to the government. Once the government assumes the burden of proof by proffering its reasons for its use of peremptory strikes, it must meet its burden. When the government's reasons do not establish a race-neutral basis for its strikes, the record reveals on its face a patent violation of a defendant's right to equal protection under both *Swain* and *Batson*.

Therefore, if the majority opinion is correct in its assertion that Taylor's *Batson* claim failed on direct appeal for failure to establish a prima facie case, then our error on direct appeal in affirming Taylor's conviction on this issue is clear and palpable. Further, the error resulted in a deprivation of Taylor's basic and fundamental right to equal protection under the law. *Union Light, Heat & Power Co. v. Blackwell's Adm'r*, Ky., 291 S.W.2d 539, 542 (1956). For similar reasons, the law of the case doctrine should not bar Taylor's Confrontation Clause claim based on the substantive use of Wade's confession.

I see no reason to argue the majority opinion's assertion that *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999), does not overrule *Taylor v.*

*Commonwealth,* Ky., 821 S.W.2d 72 (1990). It just does not matter whether it does. Binding case law and precedent in force at the time of Taylor's trial clearly hold that introduction of Wade's uncross-examined confession violated Taylor's right under the Confrontation Clause.

In *Douglas v. Alabama* two defendants—Loyd and Douglas—were charged with murder and tried separately, 380 U.S. 415, 416, 85 S.Ct. 1074, 1075, 13 L.Ed.2d 934, 935–36 (1965). Loyd was tried first and convicted. Subsequently, the prosecutor—referred to in the opinion as the "Solicitor"—called Loyd to testify against Douglas at his trial. Loyd refused to testify on Fifth Amendment grounds. The trial court ruled that the privilege did not apply and permitted the prosecution to treat Loyd as a hostile witness. The Solicitor

> then produced a document said to be a confession signed by Loyd. Under the guise of cross-examination to refresh Loyd's recollection, the Solicitor purported to read from the document, pausing after every few sentences to ask Loyd, in the presence of the jury, "Did you make that statement?" Each time, Loyd asserted the privilege and refused to answer, but the Solicitor continued this form of questioning until the entire document had been read. The Solicitor then called three law enforcement officers who identified the document as embodying a confession made and signed by Loyd. Although marked as an exhibit for identification, the document was not offered in evidence.

The statements from the document as read by the Solicitor recited in considerable detail the circumstances leading to and surrounding the alleged crime; of crucial importance, they named the petitioner as the person who fired the shotgun blast which wounded the victim.

*Id.* at 416–17, 85 S.Ct. at 1075–76, 13 L.Ed.2d at 936.

While the facts of *Douglas* are eerily similar to those of the case at bar, the results could not be more different. In reversing, the *Douglas* Court stated:

> In the circumstances of this case, petitioner's inability to cross-examine Loyd as to the alleged confession plainly denied him the right of cross-examination secured by the Confrontation Clause. Loyd's alleged statement that the petitioner fired the shotgun constituted the only direct evidence that he had done so; coupled with the description of the circumstances surrounding the shooting, this formed a crucial link in the proof both of petitioner's act and of the requisite intent to murder. Although the Solicitor's reading of Loyd's alleged statement, and Loyd's refusals to answer, were not technically testimony, the Solicitor's reading may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement; and Loyd's reliance upon the privilege created a situation in which the jury might improperly infer both that the statement had been made and that it was true. Since the Solicitor was not a witness, the inference from his reading that Loyd made the statement could not be tested by cross-examination. Similarly, Loyd could not be cross-examined on a statement imputed to but not admitted by him. Nor was the opportunity to cross-examine the law enforcement officers adequate to redress this denial of the essential right secured by the Confrontation Clause. Indeed, their testimony enhanced the danger that the jury would treat the Solicitor's questioning of Loyd and Loyd's refusal to answer as proving the truth of Loyd's alleged confession. But since their evidence tended to show only

that Loyd made the confession, cross-examination of them as to its genuineness could not substitute for cross-examination of Loyd to test the truth of the statement itself. Hence, effective confrontation of Loyd was possible only if Loyd affirmed the statement as his. However, Loyd did not do so, but relied on his privilege to refuse to answer. We need not decide whether Loyd properly invoked the privilege in light of his conviction. It is sufficient for the purposes of deciding petitioner's claim under the Confrontation Clause that no suggestion is made that Loyd's refusal to answer was procured by the petitioner, on this record it appears that Loyd was acting entirely in his own interests in doing so. This case cannot be characterized as one where the prejudice in the denial of the right of cross-examination constituted a mere minor lapse. The alleged statements clearly bore on a fundamental part of the State's case against petitioner. The circumstances are therefore such that "inferences from a witness refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant.

*Id.* at 419–20, 85 S.Ct. at 1077, 13 L.Ed.2d at 937–38 (internal citations omitted).

We have relied on *Douglas* to reverse a number of convictions on facts similar to the case at bar. *See e.g., Higgs v. Commonwealth*, Ky., 554 S.W.2d 74, 75 (1977); *Lowe v. Commonwealth*, Ky., 487 S.W.2d 935, 936 (1972); *see also Owsley v. Commonwealth*, Ky., 458 S.W.2d 457, 463 (1970). These cases remain good law. Further, neither these cases nor *Douglas* were distinguished in the majority opinion on Taylor's direct appeal. Rather, we are left to assume that the admission of Wade's confession as a hearsay exception created a magic bullet that could pierce the heart of the Confrontation Clause but render it no harm.

The statement against penal interest exception to the hearsay rule was adopted by this Court in *Crawley v. Commonwealth*, Ky., 568 S.W.2d 927 (1978). In *Crawley*, the *appellant* sought to admit a statement by a co-defendant, in which the co-defendant implicated someone other than appellant in the crimes charged. Thus, there was no potential Confrontation Clause concerns as to its admissibility. *See Lilly*, 527 U.S. at 130, 119 S.Ct. at 1897, 144 L.Ed.2d at 130. The majority opinion recognizes this fact when it argues that Taylor's confession was not admitted as a "firmly rooted" hearsay exception but rather under a rule of evidence. From there, the majority opinion implies that some of the factors used to admit the statement as a rule of evidence also served to make the statement admissible for Confrontation Clause purposes. This same tactic was used on direct appeal. The tactic was and is highly disingenuous.

The majority opinion conspicuously fails to mention that factors considered on direct appeal that related to "the circumstances surrounding the making of the confession" have been completely discredited by *Lilly* and other cases. These factors are the fact that Wade was not under arrest at the time, that he had been read his *Miranda* rights prior to questioning, that he signed a written waiver thereto, and that there was no suggestion that Wade was attempting to curry favor with the police. The *Lilly* Court summarily rejected similar arguments by the Commonwealth of Virginia. *Lilly*, 527 U.S. at 137–39, 119 S.Ct. at 1900–01, 144 L.Ed.2d at 135–36, citing *Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986).

Therefore, I would hold that, under *Douglas, supra*, there was a clear and

palpable error made on direct appeal in holding that Wade's confession was properly admitted. Further, this error without a doubt severely prejudiced Taylor at trial. It is a mistake for the majority opinion to use the law of the case doctrine to avoid reaching the result that is required to correct the errors made at trial in this case.

For the reasons set forth above, I would reverse the trial court and remand this case for a new trial.